162 N.J. Super. 145 (1978)
392 A.2d 600
CARMINE CALABRESE, PLAINTIFF-APPELLANT,
v.
TRENTON STATE COLLEGE, DEFENDANT-RESPONDENT.
CARMINE CALABRESE, PLAINTIFF-APPELLANT,
v.
DR. WILLIAM EAMES, DR. ALEXANDER FARINA AND TRENTON STATE COLLEGE, DEFENDANTS-RESPONDENTS.
CARMINE CALABRESE, PLAINTIFF-APPELLANT,
v.
DR. WILLIAM EAMES, DR. ALEXANDER FARINA, TRENTON STATE COLLEGE, ELI LILLY AND COMPANY, KETCHUM DISTRIBUTORS AND ROBBINS PHARMACY, JOINTLY OR SEVERALLY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued January 31, 1978.
Decided September 15, 1978.
*149 Before Judges MATTHEWS, CRANE and MORGAN.
Mr. Mark S. Harrison argued the cause for appellant (Messrs. Krivitzky & Springer, attorneys).
Mr. Thomas M. Curry, Deputy Attorney General, argued the cause for respondent Trenton State College (Mr. John J. Degnan, Attorney General of New Jersey, attorney; Mr. William F. Hyland, former Attorney General; Ms. Erminie L. Conley, Deputy Attorney General, of counsel).
Ms. Mary B. Rogers argued the cause for respondent Eames (Messrs. Lamb, Hutchinson, Chappell, Ryan & Hartung, attorneys; Mr. Maurice J. Gallipoli, of counsel).
Mr. John L. McGoldrick argued the cause for respondents Eli Lilly, Ketchum Distributors and Robbins Pharmacy (Messrs. McCarter & English, attorneys; Mr. Richard D. Quay on the brief).
Mr. Douglas R. Kleinfeld argued the cause for respondent Farina (Messrs. Conway, Reiseman, Michals, Wahl, Baumgardner & Hurley, attorneys).
PER CURIAM.
In this medical malpractice case primarily involving evidential problems associated with the issue of informed consent and, secondarily, the alleged obligation of drug companies to advise physicians, and others, of matters beyond that of the hazards inherent in the drug's use, plaintiff appeals a trial court order granting defendants' motion for summary judgment. The facts which figured in the challenged order, drawn from the procedural aspects of the case and from the disclosures, and deficits therein, encountered during pretrial discovery, are without substantial dispute.
On November 23, 1971 plaintiff Carmine Calabrese, then a student at defendant Trenton State College, was bitten *150 by a dog while on the campus of the college. The dog was not found and could not, therefore, be tested for rabies. Consequently, plaintiff received a series of injections of an anti-rabies vaccine, the first group of which was administered by defendant Dr. William Eames, at the College infirmary, and completed by defendant Dr. Alexander Farina, plaintiff's family physician, from vaccine received by plaintiff from Dr. Eames. According to plaintiff, neither doctor provided him with any information concerning possible adverse side effects associated with administration of the vaccine.
After the 13th or 14th injection plaintiff began experiencing some of the neurological side effects from the vaccine, which later progressed in severity to the degree that now forms the basis of his complaint. It started with confusion and an inability to concentrate. Later, the simplest of tasks became major projects. He was forced to leave college, and a job requiring administrative skills which he attempted later proved too much for him. He was demoted to a job with lesser demands. Ultimately he left that employment. He has been declared totally disabled for Federal Social Security purposes.
His treating doctors diagnose his condition variously as encephalomyelitis secondary to rabies vaccine, chronic severe organic brain damage secondary to rabies vaccine, acute depressive reaction associated with and resulting from rabies vaccination. Presently, plaintiff is unable to concentrate, think clearly, read or retain information, complete college or even hold a job. He suffers from frequent headaches, undergoes episodes of bizarre behavior and personality changes, and is otherwise unable to lead a normal life.
On July 8, 1974 plaintiff commenced suit against Doctors Eames and Farina, and Trenton State College as the employer of Dr. Eames, alleging negligence on the part of the doctors in the administration of the vaccine and their failure to warn him of its hazards, and against the College as vicariously responsible for the defaults of Dr. Eames. This complaint *151 was amended on June 3, 1975, almost a year later, to join Eli Lilly and Company (manufacturer of the vaccine), Ketchum Distributors (its distributor), and Robbins Pharmacy (the store which sold the vaccine to the College).
During the entire course of this litigation defendants encountered difficulty in securing discovery from plaintiff. With respect to his experts' reports, orders were obtained compelling their production, first on October 17, 1975 on motion of defendant Ketchum, and then on June 18, 1976 and July 12, 1976, on motion of the drug defendants and Dr. Eames, respectively. These orders required plaintiff to supply such reports by October 18, 1976 or to move before that date for a further extension of time. Plaintiff did neither. On October 22, 1976, four days after the date on which the reports were to be supplied, defendants Lilly, Ketchum, and Robbins (hereinafter "drug defendants"), moved for an order dismissing the complaint for plaintiff's failure to comply with the prior orders. It was in response to that motion that plaintiff sought a further extension of time within which to procure expert testimony in support of his case. By order dated November 3, 1976 the trial judge barred plaintiff from introducing expert testimony by any person whose name and report had not been supplied to defendants by the end of the day of October 22, 1976. Plaintiff did not appeal this interlocutory order. Nor did he seek to name experts and produce their reports at any time before defendants moved for summary judgment, heard by the trial judge on April 20, 1977. We add, parenthetically, that even by the time this appeal was argued no expert reports on the issue of "informed consent," relevant either to plaintiff's case against Doctors Eames and Farina or to the adequacy of the drug company's warnings, had been secured, and this was over three years after initiation of suit and over six years after plaintiff was bitten.
A trial court has inherent discretionary power to impose sanctions for failure to make discovery, subject only to the requirement that they be just and reasonable in the *152 circumstances. Lang v. Morgan's Home Equipment Corp., 6 N.J. 333 (1951); Brown v. Mortimer, 100 N.J. Super. 395 (App. Div. 1968); Schlosser v. Kragen, 111 N.J. Super. 337 (Law Div. 1970); R. 4:23-2(b). Despite plaintiff's protests, we conceive that the challenged order comports with those requirements. To this day plaintiff has not tendered the requested reports and indeed admits that, at present, expert proof is not available. Indeed, most of his contentions assert the adequacy of his case against the doctors and the drug defendants without the support of expert proof, further signalling plaintiff's intention to place the case before the jury in that posture. In these circumstances, we cannot hold that the trial judge mistakenly exercised his discretion in barring such testimony at trial.
We therefore proceed to an evaluation of plaintiff's case without the support of expert proof, as plaintiff suggests we do in most of his points of argument. Throughout much of his argument runs the recurrent theme that because of the modern rarity of rabid dogs, and the resultant slim chance of any dog bite victim being in any real danger of contracting disease, the vaccine for rabies, carrying with it well known dangers of serious side effects, from which plaintiff now suffers, should not be given except, perhaps, where the offending dog is known to have been rabid. According to plaintiff, the available statistical data on the remoteness of the danger of rabies, when considered in light of the possible adverse side effects associated with the anti-rabies vaccine, makes the prevention of rabies a greater hazard than the hazard presented by an untreated dog bite victim. Following this thought through to its conclusion, plaintiff asserts that the drug company defendants were duty bound to inform doctors and their patients of this statistical information, and their failure to include such facts in the informational data accompanying distribution of the vaccine provides the basis for plaintiff's claim against them. As to Doctors Eames and Farina, plaintiff contends that before commencing their course of injections of the vaccine, plaintiff should have *153 been informed not only of the possible adverse side effects of the vaccine, but of the remoteness of the risk that the dog which bit plaintiff was rabid; in short, plaintiff seems to be contending that the doctors should have advised plaintiff against use of the vaccine, or at least should have made such statistical data known to him so that he could have intelligently exercised his choice in the matter. Instead, plaintiff contends, the doctors did neither; they informed him of nothing at all but simply commenced the course of injections telling him only that if he declined such treatment, he might die if the dog was, in fact, rabid.
We affirm the summary judgment in favor of Eli Lilly and Company, Ketchum Distributors and Robbins Pharmacy. We have no doubt but that the duck-embryo vaccine against rabies with which plaintiff was treated must be classified in accordance with Restatement, Torts 2d, § 402A, comment (k), as an "unavoidably unsafe" product and, hence, not unreasonably dangerous for its intended use when properly prepared and accompanied by proper directions and warnings. Comment (k) to that section absolves from strict liability in tort those sellers who undertake "to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk." For an application of § 402A in light of comment (k) see, Brody v. Overlook Hospital, 127 N.J. Super. 331, 339 (App. Div. 1974) aff'd 66 N.J. 448 (1975). Indeed comment (k) specifically recognizes that the disease of rabies "invariably leads to a dreadful death," thus fully justifying the "marketing and use" of an unavoidably unsafe product such as rabies vaccine "which not uncommonly leads to very serious and damaging consequences when it is injected." [Emphasis added]. Plaintiff does not seriously contend that the drug was sold unaccompanied by warnings of undesirable side effects encountered in its administration; indeed, the literature accompanying the vaccine is included in his appendix.
Plaintiff's central argument that a drug manufacturer's warnings must, as a matter of law, include not *154 only information concerning undesirable side effects of the drug it is marketing but, as well, statistical information concerning the incidence of the condition for which the drug can be used, is without merit. See Bristol-Myers Co. v. Gonzales, 548 S.W.2d 416 (Tex. Civ. App. 1977); Brick v. Barnes-Hines Pharmaceutical Co., Inc., 428 F. Supp. 496 (D.D.C. 1977); Tomer v. American Home Prod. Corp., 170 Conn. 681, 368 A.2d 35 (Sup. Ct. 1976); Schenebeck v. Sterling Drug, Inc., 423 F.2d 919 (8 Cir.1970). As noted in Gravis v. Parke, Davis & Co., 502 S.W.2d 863 (Tex. Civ. App. 1973):
Once the physician has been warned, the choice of which drugs to use, and the duty to explain the risks involved, is his. These drugs were manufactured for administration only by a physician or other authorized person. Generally speaking, only a physician would understand the propensities and dangers involved. The doctor is a learned intermediary between the manufacturer and the ultimate consumer. * * *
* * * The entire system of drug distribution in America is set up so as to place the responsibility of distribution and use upon professional people. The laws and regulations prevent prescription type drugs from being purchased by individuals without the advice, guidance and consent of licensed physicians and pharmacists. These professionals are in the best position to evaluate the warnings put out by the drug industry. * * * [at p. 870]
We reverse, however, the summary judgment granted Doctors Eames and Farina on the "informed consent" issue. The materials developed on discovery raise a factual issue as to whether either doctor made any disclosure at all to plaintiff concerning possible adverse side effects of the drug he was administering. Although the trial judge was strongly influenced by Kaplan v. Haines, 96 N.J. Super. 242 (App. Div. 1967), aff'd 51 N.J. 404 (1968), the leading authoritative case concerning the proof required to support a claim based upon lack of informed consent, which strongly suggests the necessity of supporting such a claim with expert testimony, we do not read that case as requiring expert proof where no warnings at all were given. See also, Moore *155 v. Underwood Memorial Hosp., 147 N.J. Super. 252 (App. Div. 1977). According to the facts developed on pretrial discovery, plaintiff was told only that if he refused to submit to the drug he would, or might, die if the dog was rabid; he was given no information at all concerning any possible adverse consequences of the drug.
Natanson v. Kline, 187 Kan. 186, 354 P.2d 670 (Sup. Ct. 1960), cited with approval in Kaplan v. Haines, supra, 96 N.J. Super. at 257-58, draws a clear distinction between cases in which no disclosure was made and those in which some disclosure, claimed to be inadequate, was made. This distinction was expressed in the following terms in Natanson:
But contrary to the legal obligation imposed upon a physician to make a reasonable disclosure to his patient of the inherent risks and hazards of a proposed form of treatment, Dr. Kline gave the appellant no explanation whatever. He made no disclosures. He was silent. On this state of the record Dr. Kline failed in his legal duty to make a reasonable disclosure to the appellant who was his patient as a matter of law.
Conceivably, in a given case as indicated in the opinion, no disclosures to a patient may be justified where such practice, under given facts and circumstances, is established by expert testimony to be in accordance with that of a reasonable medical practitioner under the same or similar circumstances. But on the state of the record here presented the appellant was not required to produce expert medical testimony to show that the failure of Dr. Kline to give any explanation or make any disclosures was contrary to accepted medical practice. To hold otherwise would be a failure of the court to perform its solemn duty.
Whether or not a physician has advised his patient of the inherent risks and hazards in a proposed form of treatment is a question of fact concerning which lay witnesses are competent to testify, and the establishment of such fact is not dependent upon expert medical testimony. It is only when the facts concerning the actual disclosures made to the patient are ascertained, or ascertainable by the trier of the facts, that the expert testimony of medical witnesses is required to establish whether such disclosures are in accordance with those which a reasonable medical practitioner would make under the same or similar circumstances. [187 Kan. at 189-190, 354 P.2d at 672-673]
The same approach, representing a middle ground between those courts entirely dispensing with the plaintiff's obligation *156 in all informed consent cases to produce expert testimony as to the nature and extent of the obligation[1] and those courts, probably still in the majority, requiring expert proof in all cases[2], has been adopted in other cases as well. See Mallett v. Pirkey, 171 Colo. 271, 466 P.2d 466 (Sup. Ct. 1970); Stauffer v. Karabin, 30 Colo App. 357, 492 P.2d 862 (Ct. App. 1971); Collins v. Meeker, 198 Kan. 390, 424 P.2d 488 (Sup. Ct. 1967).
Hence, in a case such as this one, where it is alleged that the physician failed entirely to advise plaintiff of any of the known and existing dangers associated with a proposed course of treatment, medical testimony establishing that such a failure constitutes a departure from norms of medical practice is not an essential element of a plaintiff's case. This is so because the doctor's duty of disclosure is imposed by law and not by medical consensus. A failure to disclose any of the known and existing risks of proposed treatment when such risks might well affect a patient's decision to submit or forego the treatment, therefore, constitutes a prima facie violation of that duty; in such a case it becomes the doctor's burden to establish through his own testimony or that of other medical experts that his failure squared with accepted medical practice. Once a plaintiff proves by competent expert testimony that a given treatment, administration of a given drug, carries with it recognized and defined risks of adverse consequences[3], the *157 doctor's total failure to make any disclosure of such risks casts on him the burden of proving by expert testimony that his silence is in accord with accepted medical practice. The question will be finally resolved by the jury upon that state of proofs and under instructions from the court concerning the allocation of burdens of proof with respect to these issues.
Where, however, a doctor has been shown to have made disclosure of some of the risks associated with the proposed treatment, the alleged inadequacy of his disclosure must be established by expert medical testimony because no lay jury can be expected to reach a conclusion on such a technical matter unaided by such testimony. For example, it may well be that medical practice regards the risk material to the case as being so statistically remote that, when measured by the gravity of harm to be expected from lack of such treatment, disclosure thereof is normally not made.
In this case, plaintiff's expected testimony will be that neither doctor disclosed to him any of the risks associated with the course of injections against rabies. His pretrial testimony was to the effect that Dr. Eames simply warned him that without the injections he might die if the dog which bit him was, in fact, rabid. Dr. Farina said nothing at all. If a jury accepts this testimony, they would be entitled to find that the doctors failed entirely to inform plaintiff of the risks associated with administration of the duck-embryo vaccine, assuming, of course, that plaintiff had established the existence of the risks by competent expert proof. Such proof, therefore, provides a prima facie case resistant to a doctor's motion to dismiss for evidential insufficiency, and the doctor is burdened with proving that his silence in this regard comported with accepted medical practice.
*158 In our view, therefore, the absence of medical testimony in support of plaintiff's claim based upon lack of informed consent was not fatal to his case, and summary judgment in favor of both doctors should not have been granted.
CRANE, J.A.D. (dissenting).
I find myself in disagreement with the views of my colleagues and consequently dissent.
The majority has decided to reverse the order granting summary judgment on the premise that there exists a genuine issue of material fact, namely, whether either doctor made any disclosure to plaintiff concerning possible adverse side effects of the drug which was administered. Even if, as the majority states, plaintiff were to prove a failure to make any disclosure, thus establishing a breach of the doctor's legal duty as a matter of law, plaintiff still would be required to establish that the administration of the vaccine creates a risk of harm. The potential neurological side effects of rabies vaccine are not so commonly known as to permit a court to take judicial notice of them. The nature and extent of the risks are peculiarly within the knowledge of medical practitioners and pharmacologists. The existence of the risk may only be established by competent expert proof. Sard v. Hardy, 281 Md. 432, 379 A.2d 1014, 1024 (Ct. App. 1977); Downer v. Veilleux, 322 A.2d 82, 92 (Me. Sup. Ct. 1974); Wilkinson v. Vesey, 110 R.I. 606, 295 A.2d 676, 688 (Sup. Ct. 1972); Mason v. Ellsworth, 3 Wash. App. 298, 474 P.2d 909, 919 (Ct. App. 1970); see also, Moore v. Underwood Memorial Hosp., 147 N.J. Super. 252, 257-258 (App. Div. 1977). This the plaintiff lacks. His opportunity to present such proof has been foreclosed by an order of the trial judge which the majority agrees was proper. See Lang v. Morgan's Home Equipment Corp., 6 N.J. 333, 338-339 (1951).
NOTES
[1] Canterbury v. Spence, 150 U.S. App. D.C. 263, 464 F. 2d 772 (D.C. Cir.), cert. den. 409 U.S. 1064, 93 S. Ct 560, 34 L Ed.2d 518 (1972)
[2] 52 A.L.R.3d 1084.
[3] This appeal focussed on the necessity for expert testimony regarding the standard for disclosure, not the existence or extent of risks associated with a given course of treatment. Clearly, expert testimony as to the nature of such risks is necessary. Hence, in this case, plaintiff would have to produce expert proof that the condition from which plaintiff is suffering is a recognized risk associated with ingestion of the duck-embryo vaccine unless of course the existence and magnitude of the risk was admitted. Without such proof, a jury issue concerning the doctor's liability for failure to disclose that risk would not arise.