175 N.J. Super. 551 (1980)
420 A.2d 1305
LINDA FERRIGNO, A/K/A LINDA FERRIGNO MANNIX, MARILYN FERRIGNO, MICHAEL MANNIX, LINDA C. PIPON, LOUIS PIPON, ADRIANE WEINBERG, FRANCES WEINBERG, MARY ANNE DUFFY, PHYLLIS M. DUFFY, CYNTHIA LEVY, HARRIET LEVY, FERRIS OLIN, A/K/A FERRIS OLIN LEON, NAOMI OLIN, MITCHELL A. LEON, JOANNE WILLNER NEGER, ESTELLE WILLNER ROSENSWEIG, IRVING NEGER, ELLEN STEINER, MARTHA STEINER, KARIN JOY NOTO AND GLORIA NOTO, EACH ON THEIR OWN BEHALF, INDIVIDUALLY AND ON BEHALF OF A CLASS, PLAINTIFFS,
v.
ELI LILLY AND COMPANY; E.R. SQUIBB & SONS, INC.; ABBOTT LABORATORIES; EMONS INDUSTRIES, INC.; BOYLE & COMPANY PHARMACEUTICALS; CARNRICK LABORATORIES, DIVISION OF G.W. CARNRICK CO.; MERCK SHARP & DOHME; REXALL DRUG COMPANY; WILLIAM H. RORER, INC.; SCHERING CORPORATION; THE UPJOHN COMPANY; WINTHROP LABORATORIES, DIVISION OF STERLING DRUG CO., INC.; COLE PHARMACAL COMPANY INC.; AMFREGRANT, INC., A SUBSIDIARY OF ORMONT DRUG & CHEMICAL CO.; ARMOUR PHARMACEUTICAL COMPANY; AYERST LABORATORIES; BREON LABORATORIES; CHARLES E. FROSST & CO.; WYETH LABORATORIES, DIVISION OF AMERICAN HOME PRODUCTS CORPORATION; PREMO PHARMACEUTICAL LABS; CHEMETRON CORPORATION; R.W. GREEF & CO., INC.; A.B.C., INC., D.E.F. INC., ET AL., DEFENDANTS.
Superior Court of New Jersey, Law Division Hudson County.
Decided July 2, 1980.
*556 Myron W. Kronisch for plaintiffs (Kronisch & Schkeeper, attorneys).
John L. McGoldrick for defendant Eli Lilly and Company (McCarter & English, attorneys).
Barry Epstein for defendant Squibb & Sons, Inc. (Sills, Beck, Cummis, Radin & Tischman, attorneys).
William B. McGuire for defendant Abbott Laboratories (Lum, Biunno & Tompkins, attorneys).
*557 Robert J. McCoid for defendant Emons Industries, Inc., and Amfre-Grant, Inc. (Budd, Larner, Kent, Gross, Picillo & Rosenbaum, attorneys).
Richard J. Doyle for defendant Boyle & Company Pharmaceuticals (Shaljian, Cammarata & O'Connor, attorneys).
Walter E. Monaghan for defendant Carnrick Laboratories, Division of G.W. Carnrick Co., and Cole Pharmacal Company Inc. (Haggerty & Donohue, attorneys).
Thomas F. Campion for defendant Merck Sharp & Dohme (Shanley & Fisher, attorneys).
John P. McGee for defendant Rexall Drug Company (McDermott & McGee, attorneys).
Edmond R. Casey for defendant William H. Rorer, Inc. (O'Donnell, McCord & Leslie, attorneys).
Roger L. Toner for defendant Schering Corporation (Kuttner & Toner, attorneys).
Edwin A. Hartung for defendant The Upjohn Company (Lamb, Hutchinson, Chappell, Ryan & Hartung, attorneys).
Eugene M. Purcell for defendant Winthrop Laboratories, Division of Sterling Drug Co., Inc. (Purcell, Ries & Shannon, attorneys).
James L. Melhuish for defendant Armour Pharmaceutical Company (Morgan, Melhuish, Monaghan, McCoid & Spielvogel, attorneys).
Anita Hotchkiss, for defendant Ayerst Laboratories and Wyeth Laboratories, Division of American Home Products Corporation (Porzio & Bromberg, attorneys).
David L. Menzel for defendant Premo Pharmaceutical Labs (Stryker, Tams & Dill, attorneys).
Peter R. Feehan for defendant Chemetron Corporation (Feehan & Feehan, attorneys).
Johnathan Kohn for defendant R.W. Greef & Co., Inc. (Rothbard & Kohn, attorneys).
*558 CASTANO, J.S.C.
These are actions by eight female offspring for personal injuries they allegedly sustained because each of their mothers took a drug during pregnancy to prevent miscarriage. In the popular press, they have been denominated "the DES cases."
The first legal complication arises because plaintiffs-mothers and daughters alike-are unable to link the pills used about a quarter of a century ago to a particular drug company. Plaintiff daughters were in utero when their mothers ingested the drug; a generation has passed, and because the need to identify was not and could not have been anticipated, no records have been maintained.
Although these are complex multi-party cases with forecasts of protracted trials involving novel legal issues of major import, the parties declined the court's invitation to address some of the issues in advance of trial.
Intent on limiting the trials to the core controversy, however, the court has raised the issues considered here on its own motion. R. 4:25-1(b). See Leslie Blau Co. v. Alfieri, 157 N.J. Super. 173, 185 (App.Div. 1978). They shall be treated as if brought on by cross-motions for summary judgment. R. 4:46-1.
What I view as two of the most important issues shall be dealt with: (1) the question of nonidentification and (2) the legal principles that are to govern the trials.

Procedural History
Plaintiff Linda Ferrigno and her mother Marilyn instituted the first (Docket L-41104-75) of the two actions involved here in June 1976. The complaint sought relief on their behalf and on behalf of a proposed class.
The would-be class was generally described as
... all those females born to mothers who consumed "DES" manufactured by the defendants, and were either born in this state or reside now in this state, and either: (a) developed cancer of their genital organs; or (b) developed structural changes of their genital organs not amounting to cancer; or (c) who have been exposed, but are yet to manifest any change or disease.
*559 The Ferrigno complaint alleged that Marilyn took the drugs in 1952 and 1953 during the gestation period of Linda who was born on July 1, 1953. As a consequence, plaintiffs contended Linda developed cancer in or about 1970.
In November 1976 the Ferrignos filed a motion, in what was then the only pending action, to file an amended complaint. The amendment sought to add 19 additional plaintiffs and several additional defendants.
A month later, before a ruling had been rendered on the motion to amend, the same plaintiffs named in the proposed amendment commenced a second suit (Docket L-15621-76) against the same defendants named in the proposed amendment. Further, plaintiffs for the first time sought to name a defendant class consisting of all manufacturers, processors, packagers and distributors in the United States dealing in DES, prescribed by physicians to New Jersey women "to prevent so-called accidents of pregnancy."
In May 1977 an order was entered permitting plaintiffs to file the amended complaint in the first action and consolidating it with the second for purposes of discovery. At the same time, another order was entered staying without date the assertion of crossclaims and third-party claims.
Plaintiff class certification was denied in March 1979 and defendant class certification was likewise denied in April 1980.
Because of their scope, the actions were assigned to one trial judge who handled all phases of the litigation until March 1980, when they were reassigned to me.
In the interim, the individual claims of Linda and Marilyn Ferrigno were settled for an undisclosed amount and a dismissal was filed in March 1980. All other claims remain.

The Pleadings
Eight of the plaintiffs, including Linda Ferrigno, named in the amended complaint in the first action and in the complaint in the second suit (hereafter "the complaint"), are daughters whose mothers when pregnant with each took a synthetic estrogen prescribed by their doctors to prevent miscarriage. The *560 remaining plaintiffs are either parents or spouses of those daughters.
The complaint alleges that as a direct consequence of the mothers taking the drugs their daughters developed a variety of serious ailments, including cancer of the vagina and cervix, adenosis and certain structural changes.
From 1946 to 1972, the complaint says, the 22 defendants manufactured, distributed and sold large quantities of the kind of prescription drugs ingested by the mothers. Collectively denominated as DES by plaintiffs, the drugs are alleged to have been diethylstilbestrol, stilbestrol and dienestrol.
According to the complaint, 12 of the defendants, at an unspecified time, joined together to form an organization known as the American Drug Manufacturers Association and also formed a "Small Committee for Stilbestrol" to develop DES. These 12 companies, acting together, were responsible for getting the drug on the market.
The complaint sounds in strict liability, negligence, misrepresentation and breach of warranties.
Negligence is charged in the design, testing, investigation, experimenting with, manufacturing, packaging, marketing, distributing, inspecting, promoting and labeling of the drugs. As to misrepresentation, the complaint asserts that defendants misstated to plaintiffs and to the medical profession that the said products were adequately and fully tested, that they were safe for use as directed and that they would cause no serious or deadly long-range side effects, which was untrue, and that defendants marketed the drugs after knowing they were ineffective.
Plaintiffs also allege that defendants knew, or in the exercise of reasonable care should have known, that the drugs were capable of causing cancerous and precancerous growths and were nevertheless promoted by the defendants for prescription by doctors to pregnant women to prevent loss of the fetus by spontaneous abortion.
*561 Plaintiffs further maintain that defendants prospered from the many sales of the DES before 1972 when the Federal Food and Drug Administration (hereafter the FDA) banned its further sale and use for the prevention of miscarriages.
Plaintiffs acknowledge in the complaint that they are unable to determine in any of the cases, except for the Ferrignos, which of the defendants manufactured, distributed and sold the DES involved.[1] However, they allege that where the particular manufacturer of DES cannot be established, liability should be borne by members of the industry in proportion to the amount of DES each sold during the periods of time the product was marketed as an anti-miscarriage drug.
The answers of defendants generally deny the significant allegations of the complaint; they assert plaintiffs were negligent and invoke the statute of limitations as an affirmative defense.

The Drugs[2]
Stilbestrol and dienestrol, the two drugs named in the complaint, are the generic names for two synthetic estrogens.[3] Diethylstilbestrol is merely another name for stilbestrol and is the source of the term DES.
An estrogen is a hormone produced naturally in all women in varying levels, depending on the menstrual cycle, pregnancy, menopause and other factors. It is vital for sexual development and fertility, plays a significant role during pregnancy, and has other functions, some of which are still not fully understood by medical science.
*562 In the late 1920s natural estrogens were available for human use and were prescribed to treat the symptoms of menopause. The natural estrogens, however, were not effective orally. They had to be administered by injection in an oil solution in the buttocks. This often resulted in painful abscesses and was much more expensive than the synthetic estrogens involved in this litigation. Accordingly, in the 1930s researchers started to seek ways to develop man-made estrogens.
The first breakthrough in the field of estrogen research occurred in 1937 when an English chemist, Dr. E.C. Dodds, and his coworkers first synthesized stilbestrol at Oxford and Middlesex Hospital, England. It was believed to be the first synthetic, nonsteroidal substance that duplicated the physiological action of natural estrogens in the human body. Dienestrol was also developed by a group headed by Dr. Dodds at about the same time.
Stilbestrol represented a marked scientific advance in that, unlike natural estrogens, it was effective by mouth, thus relieving the patient of the need for injections. It was significantly less expensive, costing approximately 1/300th as much as natural estrogens.
Dr. Dodds did not patent the drug, therefore anyone who cared to, could market it.
Eventually, hundreds of companies in the United States offered DES for sale through nationwide publications referred to by doctors, pharmacists and drug wholesalers. Before the marketing of DES in this country could occur, a new drug application had to be filed and become effective pursuant to the statutory requirements imposed by the since revised Federal Food, Drug and Cosmetic Act of 1938, 52 Stat. 1040 (1938).
In 1940 a number of pharmaceutical companies sought to market stilbestrol in up to five mg. doses for various female problems, but not including miscarriage prevention.
The "New Drug Application" (hereafter NDA) a pharmaceutical company had to submit to the FDA required data on the chemical identity of the drug, control data on methods of *563 manufacture and clinical studies. The information was needed to evaluate the safety of the drug and for proposed labeling.
When more than one company submitted an NDA to market a drug, the practice developed that the FDA would direct the companies to "pool" the clinical data into one consolidated "master file" in the "public interest."
By the end of 1940 ten firms had filed ten separate applications with the FDA seeking to market DES for uses in no way related to pregnancy. In December 1940 FDA officials decided to pool all the DES clinical studies in a single file and to refer to the pooled material as a "master file."
To comply with the single filing requirement, a committee was formed to collect the clinical data and submit it to the FDA which formed a master file. The FDA also required each company to agree to broad permission clauses which permitted any company to refer to the data in the master file, regardless of the company on whose behalf the clinical study had been performed.
To insure that the chemical characteristics of each company's active ingredient in the DES as marketed were identical, the FDA also instructed the companies to utilize the same United States Pharmacopoeia standard. See 21 U.S.C.A. §§ 321(j), 351(b). In addition, steps were taken to make all companies' labeling and product literature accompanying the drug substantially uniform. Only stilbestrol was involved in the single filing. Dienestrol was not.
In May 1941 the pooled master file was formally submitted to the FDA. Submission of the clinical studies, however, did not constitute an application by any company for permission to market stilbestrol. After the submission of the investigational material, each individual company was required to file a separate NDA to market stilbestrol and many did.
Thereafter, in 1941, the FDA began issuing approvals of the NDAs, thereby permitting the marketing of stilbestrol in the United States for treatment of menopausal symptoms, senile vaginitis, gonorrheal vaginitis and suppression of lactation.
*564 Meanwhile, the clinical study of stilbestrol continued by independent physicians at major medical centers. There was increasing interest, notably at Harvard and at the Joslin Clinic in Boston, on whether it could be used to treat problems of pregnancy. Prior to the development of stilbestrol, estrogen therapy had been found to be highly effective in treating problem pregnancies.
Among the pioneers in estrogen research for use in pregnancy were a husband and wife team on the faculty of the Harvard Medical School, Dr. George Van Smith and Dr. Olive Watkins Smith. They discovered that hormonal deficiencies in pregnancy led to early miscarriage and that estrogen treatment could correct these deficiencies. At first they used the very expensive natural estrogens. Later, when stilbestrol became available, they used stilbestrol and found that it had the same physiologic effect.
Beginning in 1947 based on the reports of successful use of stilbestrol to treat problem pregnancies, several manufacturers filed NDA's with the FDA seeking permission to market stilbestrol as an aid in the prevention of certain problems of pregnancy. These new NDA's were prepared and filed independently. In the same year, various companies were permitted, for the first time, to market stilbestrol as a miscarriage preventative. Dienestrol was not approved for the same purpose until 1950.
At the time that those applications were made, the federal law provided that a new drug application became "effective" automatically if the Secretary of Health, Education and Welfare failed within a certain period of time to disapprove the application. If the agency had insufficient information to decide whether the drug was safe, or if it had information that it was unsafe, the application was denied. 52 Stat. 1052 (1938), § 505. Proof of efficacy was not required by the 1938 act.
Even though one company's application became "effective," the drug would however, continue to be regarded as "new" until that status was affirmatively terminated by a specific order of the FDA saying so. 52 Stat. 1040 (1938), § 201(p).
*565 Sometime prior to 1952 the FDA declared that DES was no longer a "new drug," which meant that any company which wanted to enter the DES market was free to do so without prior testing and without submitting an NDA to the FDA. By 1954 there were 267 companies marketing DES in this country; ultimately there were more than 287.
In 1971 Dr. Arthur Herbst and other physicians on the faculty at the Harvard Medical School published a paper which disclosed a statistical association between the use of stilbestrol in pregnancy and a form of gynecological cancer in the daughters of the pregnancy. Subsequently other studies reported a higher than expected incidence of other conditions in daughters whose mothers were given stilbestrol to prevent miscarriage.
In 1972 the FDA banned the further sale and use of the synthetic estrogen drugs for the prevention of miscarriages and ordered the drug companies to warn physicians and the public that the drug should not be used by pregnant women because of the danger to their unborn children.
For other purposes, however, the drug is still prescribed today. It is presently approved for use as an estrogen replacement in cases of hormone deficiency, therapy for menopausal symptoms, treatment of some cases of cancer, and suppression of lactation. It is also the major ingredient in the "morning after" pill, a post-coital contraceptive.

Identification
Since only a few of the plaintiffs can identify the manufacturer, the threshold issue is: Will the cause of action of a plaintiff who cannot identify the drug company whose product harmed her withstand a motion for summary judgment?
There are actually two parts to the problem: (a) the inability to identify the precise causative agent and (b) the possibility that the unidentified causative agent is not one of the defendants before the court.
The same two issues were involved in Anderson v. Somberg, 67 N.J. 291 (1975). On the first, there was apparent unanimity by the court. The second issue sparked a disagreement.
*566 There the plaintiff was injured when a surgical instrument-a rongeur-broke off in his spinal canal during an operation for removal of a disc. He sued the doctor and the hospital for negligence, the instrument's distributor for breach of warranty and its manufacturer in strict liability.
Except to say that the culpable party was one who was in some way connected with the instrument, plaintiff could not conclusively identify him since he was unconscious when the mishap occurred.
Both the plurality and the dissent, however, agreed that under circumstances where a plaintiff, through no fault of his own, was not able to identify precisely who harmed him, although he could say it was one member of a group, it was appropriate to shift the burden of proof. Instead of plaintiff pinpointing the causative agent by a preponderance of the evidence it became the obligation of defendant to establish by a preponderance of the evidence that he was not the precise causative agent. The shift was from inculpation to exculpation.
The significance of unanimity on the first issue is dramatized by the nature of the disagreement on the second. What the plurality and the dissent differed upon was whether it could be presumed that all of the possible defendants were before the court.
The dissent protested:
... how then can it be said that the wrongdoer is surely in court! There is a far greater likelihood that he is no party to this litigation at all and that his identity will never be established. [At 308.]
The plurality rejoindered:
... the fact remains that involvement by any person other than the defendants actually before the court below has never been asserted as anything other than pure and undisguised speculation. None of the defendants introduced any evidence to actually support the claim of responsibility by other persons; they made no effort to join additional parties. It would be exceedingly unjust to deny plaintiff compensation simply because an imaginative defendant can conceive of other possible parties. [At 305.]
Presuming all defendants were before the court, the plurality moved beyond a mere shift in the burden of proof and held that the jury must find one defendant liable. Unwilling to make the *567 same presumption, the dissenters said the jury should not be mandated to find liability but should be free to determine as to each defendant whether that defendant had met the burden that had been shifted to him of exculpating himself.
Clearly, therefore the dissenters recognized that plaintiff's case should not be dismissed merely because of the possibility that the precise causative agent was not before the court. It seems equally clear that the plurality which went well beyond this position would agree.
Anderson v. Somberg, therefore, deals with both the issue of inability to identify the precise causative agent and the possibility that the precise causative agent is not among the defendants before the court, and holds, seemingly without dissent on both issues, that a plaintiff's cause of action survives either event.
Admittedly Anderson is contextually different than the instant cases and contains repeated language evincing an intent to restrict its application. Phrases such as "in the type of case we consider here" (at 298) "exceptional special cases, as where defendant owes a special responsibility" (at 302), "at least if limited to this kind of medical malpractice case" (at 310) and "certainly no farther" (at 310) are found in the plurality and dissent.
Are the clear principles that Anderson embodies then to be limited to the hospital operating room or are they broad enough to be applied to the DES problem? For a number of reasons hereinafter stated and with a recognition that this is an extension of existing law in the State of New Jersey, I conclude that the same principles shall apply to the DES plaintiffs and that a shift from inculpation to exculpation is reasonable and justified.
At the outset, it must be noted that there are many parallels between the Anderson situation and the plight of the DES plaintiffs.
First, in both cases defendants are members of a group, all of whom are potentially at fault. All defendants in the instant case are alleged to be in some way associated with the manufacture, *568 marketing or distribution of DES at a time and place when and where their product possibly could be the one ingested by plaintiff's mother.
Second, both sets of defendants owed a special responsibility to plaintiff. Even if their respective products were deemed to be unavoidably unsafe, defendants had a special responsibility to see to it that the drugs were properly prepared, properly marketed and that proper warning was given.
Third, plaintiffs are totally innocent. Like the unconscious Anderson on the operating table, the DES plaintiffs were unconscious in utero. (It should be noted that while defendants have vigorously contested virtually every issue raised, they have never suggested that plaintiffs were anything but innocent. Indeed, they cannot.)
Fourth, the mishap that has befallen plaintiffs was not reasonably foreseeable by them and was unrelated to the purpose for which the drug was ingested by the plaintiff mothers.
Fifth, while defendants in the DES cases may not have knowledge superior to that of plaintiffs as to identification, the frustration which plaintiffs have continuously experienced has been caused to some degree by defendants themselves, albeit inadvertently. Defendants marketed the drug generically, making it a fungible item without a name tag. In addition, the drug by its very nature did not give any clues of its ill effects until a generation after its use, long after any records that any consumer might keep were reasonably discarded.
Moreover, the reasons for not leaving the plaintiff without a remedy are even more compelling from a policy standpoint in the DES cases then they were in Anderson, where it was recognized from the outset that some defendants were not wrongdoers at all. They just happened to be present and conscious when the act that gave rise to the injury occurred. They were truly innocent in every sense of the word.
In the instant cases, all of the defendants allegedly were wrongdoers. If plaintiffs' allegations have merit, none of the defendants are innocent. Plaintiffs contend that defendants *569 produced a drug that was not fit, suitable or safe, and in view of their expertise they should have known it was not. Plaintiffs also assert that defendants' drug was totally inefficacious as a miscarriage preventive and was marketed solely from a profit motive.
In New Jersey there is a "strong policy which favors recovery by innocently injured plaintiffs who could not otherwise recover because they cannot identify the source of their injuries." Lyons v. Premo Pharmaceutical Labs, Inc., 170 N.J. Super. 183, 192-193 (App.Div. 1979). See, also NOPCO Chemical Div. v. Blaw-Knox Co., 59 N.J. 274 (1971). That policy becomes even more compelling when an innocent plaintiff is paired off against allegedly culpable defendants.
I am not unmindful that the California Supreme Court only recently rejected the alternative liability theory in identical DES circumstances because all of the parties who were or could have been responsible were not joined as defendants. Sindell v. Abbott Laboratories, 26 Cal.3d 588, 163 Cal. Rptr. 132, 139 (1980).
The court pointed out:
... the possibility that any of the five defendants supplied the DES to plaintiff's mother is so remote that it would be unfair to require each defendant to exonerate itself. There may be a substantial likelihood that none of the five defendants joined in the action made the DES which caused the injury, and that offending producer not named would escape liability altogether. [163 Cal. Rptr. at 139.]
In New Jersey, however, that same possibility did not deter the Supreme Court in Anderson although the problem was recognized. The dissent, as part of the disagreement with the plurality, noted:
... the record is replete with testimony that other surgeons-perhaps as many as twenty-have used the rongeur during the four years that it has formed part of the surgical equipment of the hospital, and that any one or more of them may perfectly well have been responsible for so injuring the instrument that it came apart while being manipulated in plaintiff's incision.... [67 N.J. at 306.]
and further that
... [t]here is far greater likelihood that he [the wrongdoer] is no party to this litigation at all and that his identity will never be established. [Id. at 308.]
It is interesting to observe that both courts used the almost identical language. California spoke of a "substantial likelihood" *570 and New Jersey of "a far greater likelihood" that the specific wrongdoer is not a named defendant. Our Supreme Court, nevertheless, did not feel that it was unfair to require each defendant to exonerate himself despite such a likelihood.
For that reason I decline to accept the Sindell evaluation of alternative liability. See Abel v. Eli Lilly and Co., 94 Mich. App. 59, 289 N.W.2d 20 (Ct.App. 1980).
Moreover, the possibility that one wrongdoer can escape liability altogether while another tortfeasor may be compelled to pay more than his actual share of the damages has long been tolerated in New Jersey. Under the so-called "single indivisible injury" rule applied to chain collisions of automobiles which crash in rapid succession to produce a single end result, it is impossible to establish what damages are separately caused by each party's collision or even whether a particular crash participant actually caused any damage at all. Yet, a defendant will be held jointly and severally responsible if he is unable to exculpate himself. Hill v. Macomber, 103 N.J. Super. 127 (App. Div. 1968).
Since in my view the identification issue can be decided by following existing precedent, it is unnecessary to consider such new liability theories as "enterprise liability" (see Hall v. E.I. Du Pont de Nemours & Co., Inc., 345 F. Supp. 353 (E.D.N.Y. 1972)) and "fair share of the market" (see Sindell v. Abbott Laboratories, supra) that have been urged by plaintiffs. See, also, Sheiner, "DES and a Proposed Theory of Enterprise Liability," 46 Fordham L.Rev. 963 (1978). The "concert of action" theory also advanced by plaintiffs has already been rejected in Lyons v. Premo Pharmaceutical Labs, Inc., supra, on exactly the same facts. Although plaintiffs suggest that there is information here that was not before the Lyons court, I find nothing additional to be significant.
The language in the Lyons opinion best sums up why "concert of action" does not fit the facts:
Plaintiffs have tried to ignore all distinctions between the 1940 and the 1947 applications to market drugs with DES. It should be remembered that its use to combat abortions, which is the only issue here, resulted from the 1947 applications. *571 It is true, as plaintiffs argue, that the companies made reference in their 1947 application to those of 1940; however, it must be borne in mind that it is not the safety of DES which is being questioned; it is only its ingestion by pregnant women which has been declared unsafe, and the 1940 applications did not contemplate that use.
Plaintiffs have ignored these distinctions....
[Defendants in 1947] relied on articles appearing in medical journals on the use and safety of DES as a drug for combatting miscarriage. And ... these reports resulted from the enthusiasm of the medical profession itself for what doctors saw as a possible panacea for pregnancy problems.
The 1940 applications do not support the "drag race" analogy because there was nothing anti-social about placing DES on the market for its pre-1947 purposes. Plaintiffs apparently overlook the fact that products containing DES are still in use today with full approval of the FDA and the Surgeon General. It can hardly be said, therefore, that the drug companies' conduct in seeking approval for the drug in 1940 should be classified as tortious. It is 1947 with which we are concerned.... [170 N.J. Super. at 193-194.]
"Concert of action" was likewise repudiated on the same facts by the California Supreme Court in Sindell, supra:
What the complaint appears to charge is defendants' parallel or imitative conduct in that they relied upon each others' testing and promotion methods. But such conduct describes a common practice in industry: a producer avails himself of the experience and methods of others making the same or similar products. Application of the concept of concert of action to this situation would expand the doctrine far beyond its intended scope and would render virtually any manufacturer liable for the defective products of an entire industry, even if it could be demonstrated that the product which caused the injury was not made by the defendant. [163 Cal. Rptr. at 141.]
The instant complaint does not suggest there was a common understanding or common plan among defendants except that prompted in 1941 by the FDA's single filing requirement. There are no allegations whatever about concerted activities in 1947. The 1947 applications may not be linked to the earlier NDAs merely because they may have involved some of the same parties.
Under the alternative liability theory to be applied in these cases, there are many ways a defendant may exculpate itself. Probably the best way is to identify the actual manufacturer.
But there are other approaches too. For instance, it can prove that it never manufactured or sold the generic drug involved in a particular case. (A stilbestrol defendant does not belong in a dienestrol case, and vice versa.)
*572 It can show it did not manufacture DES until after plaintiff was born. It can show that it never manufactured or marketed a synthetic estrogen for the purpose of preventing miscarriages. It can show that none of the synthetic estrogen it manufactured or marketed could have reached the outlet where the plaintiff mother purchased it. It can show that it never manufactured the drug in the size, shape, color or with the labelling of that which the plaintiff mother ingested. Anticipated motions assuredly will show many more ways.
Moreover, those defendants who are not able to exculpate themselves will not be left totally without a remedy. If more than one fails to exculpate itself and liability attaches, those who remain will be "jointly or severally liable in tort for the same injury." In other words, they will be "joint tortfeasors" as that term is defined under the Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-1 et seq.
Consequently, any unexculpated defendant will be able to recover contribution from any other joint tortfeasor for any excess paid in satisfaction of a judgment "over his pro rata share...." N.J.S.A. 2A:53A-3. Since with the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 et seq., the Legislature redefined "the `pro rata' allocation to be a party's `percentage share,'" Cartel Capital Corp. v. Fireco of New Jersey, 81 N.J. 548, 569 (1980), it is the "percentage share" of each unexculpated defendant in any judgment that will have to be determined.
One issue, however, remains unresolved. On what basis is the jury to allocate the percentage share of the fault among the defendants? The common fault in these cases relates to having manufactured the DES for anti-miscarriage purposes with an unrefuted probability that it was the DES ingested by the plaintiff mother.
Among defendants who fail to exculpate themselves the only variant is that one may have supplied more of the drug to the market source than another, thereby creating a greater probability that its DES caused the injury.
*573 The only court that has dealt with the problem has held that "percentage share" under these circumstances means that "[e]ach defendant will be held liable for the proportion ... represented by its share of that market...." Sindell v. Abbott Laboratories, supra, 163 Cal. Rptr. at 145.
Using this language, Sindell fashioned a new theory of liability denominated the "share of the market" liability. Although our cases indicate a preference for joint and several liability, I find the California approach a reasonable solution to determine the "percentage share" among unexculpated defendants pursuant to N.J.S.A. 2A:53A-3 and 2A:15-5.3 and shall invoke it in this case for that purpose alone.
Consistent therewith, the prior order staying without date the filing of crossclaims and third-party claims will be vacated and pursuant to R. 4:8-1 defendants may file and serve such crossclaims and third-party claims in accordance with and in the time period set forth in the order that accompanies this opinion.

The Legal Principles that Govern
The second issue raised concerns the legal principles that are to govern the trials of these cases. The amended complaint pleads negligence, strict liability, misrepresentation and breach of warranty.
New Jersey has been in the forefront in developing a sophisticated body of law in the area of products liability, beginning with Henningsen v. Bloomfield Motors Inc., 32 N.J. 358 (1960), and continuing through to Suter v. San Angelo Foundry and Machine Company, 81 N.J. 150 (1979). This evolution moved from negligence and warranty theories, borrowing concepts from both, and arrived at strict liability.
The development is summarized in Heavner v. Uniroyal, Inc., 63 N.J. 130, 146-152 (1973), and updated in Cepeda v. Cumberland Engineering Co., Inc., 76 N.J. 152, 168 (1978), and in Suter, supra. See, also, Torsiello v. Whitehall Laboratories, 165 N.J. Super. 311, 319 (App.Div. 1979), certif. den. 81 N.J. 50 (1979).
As pointed out in Cepeda, supra, 76 N.J. at 168-169, and Torsiello, supra 165 N.J. Super. at 319, the decisions in this State *574 have either expressly or tacitly adhered to the principles stated in the Restatement, Torts, 2d (1965), § 402A (hereafter the Restatement), the black letter portion of which reads as follows:
Special Liability of Seller of Product for Physical Harm to User or Consumer
(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
Following it are 17 lettered comments which explain and qualify the section, many of which have also been incorporated into the law of this jurisdiction. In fact, only one aspect of § 402A and its appended comments has been specifically rejected. In Suter, supra, the Supreme Court rejected the "unreasonably dangerous" qualification of defective condition.
All of the landmark cases in New Jersey, however, have dealt with machines such as automobile, and manufacturing equipment. None concerned drugs or pharmaceuticals.
There are six so-called products liability drug cases: Torsiello v. Whitehall Laboratories, supra; Lyons v. Premo Pharmaceutical Labs, Inc., supra; Calabrese v. Trenton State College, 162 N.J. Super. 145 (App.Div. 1978); Moore v. Underwood Memorial Hospital, 147 N.J. Super. 252 (App.Div. 1977); Brody v. Overlook Hospital, 127 N.J. Super. 331 (App.Div. 1974), aff'd 66 N.J. 448 (1975), and Jackson v. Muhlenberg Hosp., 96 N.J. Super. 314 (Law Div. 1967), rev'd on other grounds 53 N.J. 138 (1969).
Although covered by the same comment to § 402A as the drug cases, Brody, strictly speaking, is not a pharmaceutical case. It deals with blood plasma. So do Moore and Jackson. Torsiello concerns over-the-counter drugs, not prescription drugs. Calabrese and Lyons deal with ethical drugs, but the Lyons opinion *575 is devoted to a discussion of the "identification" issue and does not go much beyond a simple statement of its application.
Nevertheless, one clear rule emerges. In drug cases New Jersey law is controlled by the rules stated in comment k, one of the 17 comments that follow § 402A. Entitled "Unavoidably Unsafe Products," it provides in part:
There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended or ordinary use. These are especially common in the field of drugs.... Such a product, properly prepared, and accompanied by proper directions and warning is not defective.... It is... true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.
None of the New Jersey cases have considered what impact comment k has on the body of products liability law developed to date in the machine cases, or vice versa.
Cases cited from other jurisdictions have dealt chiefly with the duty to warn and the duty to test. None analyze whether the rules stated in comment k automatically apply in all drug cases or whether there are instances when they are inapplicable.
In this case plaintiffs have urged that if they are able to establish by the requisite standard of proof to the satisfaction of the jury that DES did not have any efficacy, defendants lose their so-called comment k protection. As might be expected, defendants vigorously disagree.
Plaintiffs cite no authority for their position. They merely make the assertion as a legal premise. The only other reference to a similar suggestion is contained in a footnote to a law review article which is uniformly cited in all DES cases and which represents what I view as probably the most exhaustive analysis of the problems raised in these cases. See Scheiner, "DES and a Proposed Theory of Enterprise Liability," 46 Fordham L.Rev. 963, 972, n. 25 (1978).
*576 At the outset, it is clear that although the comment k rules appear under the title "Topic 5. Strict Liability" in the Restatement, they are not strict liability rules at all. They are merely rules of negligence embodying the long-standing concepts of a lack of due care and foreseeability of the risk.
Of course, New Jersey has already adopted a negligence standard in products cases where the defect is one of design rather than of manufacture. The Supreme Court acknowledged that with the same quotation from Prosser in both the Cepeda (76 N.J. at 172) and Suter opinion (81 N.J. at 171):
... "[s]ince proper design in a matter of reasonable fitness, the strict liability adds little or nothing to negligence on the part of the manufacturer...."
But there is a significant difference between machine design and drug cases! In design cases New Jersey imputes foreseeability of the danger to the manufacturer by operation of law, even if it was in fact unknowable at the time of manufacture and distribution. Cepeda, supra, 76 N.J. at 172. It is assumed that defendant knew of the harmful character of the product. A plaintiff is not required to prove scienter as a matter of fact and the ultimate risk-utility question is framed in terms of whether a reasonably prudent manufacturer, knowing of the product's potential to harm or injure at the time he placed it on the market, would have placed it on the market. Whether the manufacturer knew or by the exercise of reasonable care could have known is not relevant.
As long as New Jersey adheres to comment k, however, there can be no such assumption that a drug manufacturer knew of the harmful character of a drug, if that fact was unknowable at the time of manufacture. It is not charged with foreseeability, but only with that knowledge which it could have acquired through the exercise of reasonable care.
"In the present state of human knowledge" and "such experience as there is," the key phrases in comment k, refer to the time of marketing and use, thereby distinguishing the drug cases from the machine cases.
*577 Therefore, in prescription drug cases, strict liability is applicable in only two instances: (1) where the drug could not reasonably have appeared to be useful and desirable at the time of manufacture or (2) where, despite some apparent efficacy, the medically recognizable risk foreseeably outweighed its utility.
The Appellate Division recognized that to be the rule in Calabrese v. Trenton State College, supra: (p. 153 of 162 N.J. Super.)
Comment k ... absolves from strict liability in tort those sellers who undertake `to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.' [162 N.J. Super. at 153, emphasis supplied]
As a consequence, I conclude that each plaintiff must first prove the following elements: (1) that her mother took DES; (2) that DES causes cancer in female offspring or causes whatever malady it is alleged plaintiff has, and (3) that the cancer or other condition of plaintiff was caused by the ingestion of DES by her mother. In my view, present-day scientific knowledge will be admissible on the second and third elements.
In those instances where plaintiff can identify the drug company which produced the DES her mother took, establishment of that fact will be her next step. Where the drug cannot be linked to a particular company, plaintiff will have to show as to each defendant that that defendant manufactured or marketed DES that was sold in New Jersey prior to the time that the plaintiff mother took it and that its production of the drug was for use as a miscarriage preventive.
Whether the drug company can be specifically identified or not, the next question is whether the product was apparently useful and desirable. Stated another way, the question is: Did it reasonably appear to be efficacious at the time it was manufactured, marketed and distributed? This is the dispute as to efficacy previously adverted to. In my view, if it did not, comment k rules will not apply and the established rules of strict liability defined in the machine cases will. See Keeton, "Products Liability-Drugs and Cosmetics," 25 Vanderbilt L.Rev. 131, *578 135 (1972). Was DES fit, suitable and safe? If not, did the defect exist at the time the product was placed in the stream of commerce? Did the defect cause the injury?
If, on the other hand, without the benefit of time-of-trial hindsight, the drug reasonably appeared to be useful and desirable, comment k will apply. The next question posed is whether there was a medically recognizable risk, that is, a risk that could have and should have been discovered in the exercise of due care. If human knowledge as it existed at the time of the manufacture or distribution did not indicate a risk, there will be no liability.
However, if the product appeared to be reasonably efficacious at the time it was manufactured and if there was a medically recognizable risk, the next issue is whether the risk was outweighed by the apparent usefulness and desirability of the product.
This is nothing more than the Cepeda-Suter risk-utility analysis except that, as indicated above, scienter will not be presumed. In my view, most of the same factors can be considered: the overall usefulness and benefit to the user and to the public as a whole; the likelihood that the product would cause injury and the seriousness of such injury; the availability of a substitute product at the time of sale and distribution which would meet the same need as this product, but would not be as unsafe; the ability of the manufacturer to eliminate the unsafe character of the product without impairing its usefulness; and the expense involved to the manufacturer in eliminating the unsafe character of the product.
As mandated by Cepeda-Suter, the trial judge shall first determine whether a balanced consideration of the foregoing factors would preclude liability as a matter of law. If not, the same factors shall be submitted to the jury to decide a just result between the parties.
If a plaintiff is able thereby to establish that such experience as there was did not justify the marketing and use of the drug with its medically recognizable risk, she will prevail without *579 more. If, on the other hand, a jury determines that the apparent usefulness outweighed the risk, she must establish that either the drug was not properly prepared or that there was negligence in the manner of marketing.
The former has to do with testing while the latter pertains to proper warnings and directions. Both are dependent upon the foreseeable risk of harm to potential users in light of the scientific and medical knowledge then existing. O'Hare v. Merck & Company, 381 F.2d 286, 291 (8 Cir.1967).
It is beyond dispute that a drug manufacturer has a duty to test its product adequately for safety prior to marketing. Tinnerholm v. Parke Davis & Co., 285 F. Supp. 432, 446 (S.D.N.Y. 1968). If there are existing reports of side effects or dangers in the use of its product, the manufacturer may not ignore them. It must test for them. See Rheingold, "Products Liability-The Ethical Drug Manufacturer's Liability," 18 Rutg. L.Rev. 947, 997 (1964).
Some defendants have argued that evidence of FDA approval after submission of test results forecloses evidence of inadequate testing and precludes liability as a matter of law. It does not. Jackson v. New Jersey Mfr. Ins. Co., 166 N.J. Super. 448, 462 (App.Div. 1979). See, also, Torsiello v. Whitehall Laboratories, supra, 165 N.J. Super. at 326, n. 4. Evidence that the drug was marketed pursuant to FDA approval after submission of test results may be considered by the jury on the issue of whether proper care in general, and adequate testing in particular, were exercised, but it is in no way binding on the fact-finders.
As to warnings, the obligation of the drug manufacturer is exhaustively and clearly set forth in Torsiello v. Whitehall Laboratories, supra, in which the court explicitly endorsed comment j to § 402A for the first time in this State and held that the issue of adequate warnings is governed by both the rules stated in comment j and § 388 of the Restatement. Although Torsiello is an over-the-counter drug case, much of its definitive *580 holding is applicable to prescription drugs and to these cases.
The comment reads in part as follows:
j. Directions or warning. In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use. The seller may reasonably assume that those with common allergies, ... will be aware of them, and he is not required to warn against them. Where, however, the product contains an ingredient to which a substantial number of the population are allergic, and the ingredient is one whose danger is not generally known, or if known is one which the consumer would reasonably not expect to find in the product, the seller is required to give warning against it, if he has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the ingredient and the danger. Likewise in the case of poisonous drugs, or those unduly dangerous for other reasons, warning as to use may be required.
........
Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous.
§ 386 provides:
Chattel Known to Be Dangerous for Intended Use
One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.
Actually, the obligation to warn of a foreseeable risk was part of New Jersey law even before the 1965 edition of the Restatement was promulgated. Martin v. Bengue, Inc., 25 N.J. 359, 362, 371 (1957). So no new theory of law is involved in saying that a drug manufacturer has a duty to warn of any dangers inherent in the use of the drug, of which it has knowledge or which through the exercise of reasonable care, it could discover by utilizing scientific or other medical data available at the time of the use of the drug.
*581 However the adequacy of the directions and warnings are not to be judged on the basis of facts or discoveries made known subsequent to the date of use of the prescription drug under the rules set forth in comment k. See Jackson v. N.J. Mfr. Ins. Co., supra, 166 N.J. Super. at 465-466, discussing Torsiello v. Whitehall Laboratories, supra, on this subject.
On the other hand, drug companies under New Jersey law have a continuing duty to monitor scientific or medical discoveries and knowledge and to notify purchasers thereof. The obligation was acknowledged in Jackson, supra:
We recognize that there are products liability cases from other jurisdictions which speak of a manufacturer's or seller's "continuing duty to warn." See 1 Frumer & Friedman, Products Liability, § 802 (1978); see, generally, Prosser, Torts (4 ed. 1971), § 96 at 646-647, n. 67. Our review of these cases leads us to conclude that this phrase has been used most often to describe no more than the obligation imposed where a manufacturer or seller, believing that it has sold a non-defective product, subsequently learns that its product was, in fact, defective when placed in the stream of commerce. In these circumstances, saying that there is a "continuing duty to warn" is, of course, a tacit recognition that the duty existed in the first instance. [166 N.J. Super. at 466, n. 3.]
Consequently, a warning deemed legally adequate when the drug left the control of the manufacturer may be rendered deficient by actual or constructive knowledge acquired subsequently, but before use of the drug if a reasonable opportunity to warn of the new discoveries existed.
Both plaintiffs and defendants agree that in prescription drug cases the warning required is not to the general public or to the patient, but to the prescribing physician. Torsiello v. Whitehall Laboratories, supra, 165 N.J. Super. at 322-323. The question presented here is whether the warnings that were given to the prescribing doctors were proper and adequate.
The drug company's duty was lucidly set forth in Calabrese v. Trenton State College, supra, 162 N.J. Super. at 154, quoting from Gravis v. Parke Davis & Co., 502 S.W.2d 863, 870 (Tex.Civ. App. 1973):
Once the physician has been warned, the choice of which drugs to use, and the duty to explain the risks involved, is his. These drugs were manufactured for administration only by a physician or other authorized person. Generally speaking, only a physician would understand the propensities and dangers involved. The doctor is a learned intermediary between the manufacturer and the ultimate consumer. * * *

*582 ... The entire system of drug distribution in America is set up so as to place the responsibility of distribution and use upon professional people. The laws and regulations prevent prescription type drugs from being purchased by individuals without the advice, guidance and consent of licensed physicians and pharmacists. These professionals are in the best position to evaluate the warnings put out by the drug industry....
When directions and warning have been given to the physician, the choice involved is essentially a medical one involving an assessment of the medical risks in the light of the physician's knowledge of his patient's needs and susceptibilities. Some defendants have argued that if a warning is deemed to be inadequate, it shall be part of plaintiff's burden to establish that the doctor in fact relied on the warning given and did not proceed on his own professional judgment without regard for the warning. See Douglas v. Bussabarger, 73 Wash.2d 476, 438 P.2d 829, 831 (Sup.Ct. 1968). I disagree. In the absence of proof that a physician did not rely on the warnings, it will be presumed that he did.
The proofs on the subjects of testing and warning may differ, depending on whether the manufacturer or distributor is identified or whether part of an unexculpated group. Where there is identity, a plaintiff can focus on the specific practices and procedures of that particular defendant, probably elicited through discovery, especially where she is not in a position to say what warnings were actually communicated to her mother's doctor.
On the other hand, where the defendants are part of an unexculpated group, disparate practices and procedures of one defendant are not admissible for there would be no way of knowing whether they were the warnings actually given in a particular case. In such a situation, a plaintiff will be limited to that conduct of defendants which was identical as to all or, in the alternative, she will have to produce proof of the specific warnings given in her case. In the latter event each defendant thereby will have an additional opportunity to exculpate itself by showing, for instance, that the warning given in the specific case was not the type of warning that it ever gave and consequently it could not have been the manufacturer.
*583 I am mindful that the views expressed in this opinion are novel and represent an extension of existing decisional law in New Jersey. I conclude, however, that the balance of equities requires more than a sterile application of precedents. Wholly faultless plaintiffs should not be rejected merely because no other court in this State has as yet considered the legal questions raised against the factual backdrop we have here.
All defendants who believe they are entitled to exculpation on facts as to which they assert there is no genuine dispute shall file motions for judgment pursuant to R. 1:6-2 in accordance with and in the time period set forth in the order that accompanies this opinion.
NOTES
[1] As a result of later discovery, apparently identification can be made in at least two other cases.
[2] The following facts have been gleaned from affidavits and discovery material to which the court's attention has been called. It is believed they are not disputed.
[3] Defendants insist that only stilbestrol is properly denominated DES and that dienestrol is chemically distinct from DES. I express no opinion on the similarities or differences between the substances, but simply adopt the designation DES for both in this opinion.