170 N.J. Super. 183 (1979)
406 A.2d 185
THOMAS LYONS, ADMINISTRATOR OF THE ESTATE OF JOAN LYONS, CLAIRE LYONS AND THOMAS LYONS, PLAINTIFFS-APPELLANTS,
v.
PREMO PHARMACEUTICAL LABS, INC., A CORPORATION OF THE STATE OF NEW JERSEY, CHEMETRON CORPORATION, AND SPECIFIC PHARMACEUTICALS, INCORPORATED, DEFENDANTS, AND MERCK & COMPANY, INC., A CORPORATION OF THE STATE OF NEW JERSEY, SHARP & DOHME, INC., A CORPORATION OF THE STATE OF NEW JERSEY, MERCK, SHARP & DOHME, DIVISION OF MERCK & CO., INC., WINTHROP LABORATORIES, DIVISION OF STERLING DRUGS, ABBOTT LABORATORIES, ARMOUR PHARMACEUTICAL CO., DIVISION OF ARMOUR AND CO., SUBSIDIARY OF GREYHOUND CORP., AYERST LABORATORIES, DIVISION OF AMERICAN HOME PRODUCTS CORP., BREON LABORATORIES, A SUBSIDIARY OF STERLING DRUGS, ELI LILLY & COMPANY, E.R. SQUIBB & SONS, INC., WYETH LABORATORIES, DIVISION OF AMERICAN HOME PRODUCTS CORP., THE UPJOHN COMPANY, AND R.W. GREEFF & CO., INC., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 16, 1979.
Decided August 8, 1979.
*186 Before Judges MATTHEWS, KOLE and MILMED.
Mr. Frank P. Marano argued the cause for appellants.
*187 Mr. Thomas F. Campion argued the cause for respondents Merck & Co., Inc., Sharp & Dohme, Inc., and Merck, Sharp & Dohme, a Division of Merck & Co., Inc. (Messrs. Shanley & Fisher, attorneys; John Zen Jackson, on the brief).
Mr. Thomas M. Mulcahy argued the cause for respondents Winthrop Laboratories and Breon Laboratories (Messrs. Purcell, Ries & Shannon, attorneys; Ms. Eugene M. Purcell, of counsel).
Mr. William B. McGuire argued the cause for respondent Abbott Laboratories (Messrs. Lum, Biunno & Tompkins, attorneys; Mr. Steven E. Brawer on the brief).
Mr. James L. Melhuish argued the cause for respondent Armour Laboratories (Messrs. Morgan, Melhuish, Monaghan & Spielvogel, attorneys).
Ms. Anita Hotchkiss argued the cause for respondents Ayerst Laboratories, Division of American Home Products Corp. and Wyeth Laboratories, Division of American Home Products Corp. (Messrs. Porzio & Bromberg, attorneys; Mr. Myron J. Bromberg, of counsel).
Mr. John McGoldrick argued the cause for respondent Eli Lilly and Company (Messrs. McCarter & English, attorneys; Mr. Stuart E. Rickerson, of counsel).
Ms. Susan Eleff, argued the cause for respondent E.R. Squibb & Sons, Inc. (Messrs. Sills, Beck, Cummis, Radin & Tischman, attorneys; Mr. Barry M. Epstein, of counsel; Mr. Donald Zarin on the brief).
Ms. Mary B. Rogers argued the cause for respondent The Upjohn Company (Messrs. Lamb, Hutchinson, Chappell, Ryan & Hartung, attorneys; Mr. Edwin A. Hartung, of counsel and on the brief).
*188 Mr. Jonathan Kohn argued the cause for respondent R.W. Greeff & Co., Inc. (Messrs. Rothbard, Rothbard & Kohn, attorneys; Messrs. Alexander L. Caccia, Paul F. Nash and Joseph P. Giasi, Jr. on the brief).
PER CURIAM.
This is an appeal from two judgments, both resulting from the same cause of action. It presents questions relating to liability for injuries caused by the taking of a drug during pregnancy.
On September 26, 1956, near the end of her first trimester of pregnancy, plaintiff Claire Lyons notified her obstetrician that she was experiencing some bleeding. To prevent spontaneous abortion, he prescribed a drug generically known as stilbestrol or diethylstilbestrol (DES). The prescription, which specified no particular brand, was phoned in to a local pharmacy and filled with stilbestrol tablets manufactured by Premo Pharmaceutical Labs, Inc. Mrs. Lyons took four of the 25 milligram pills daily for 12 days, after which the medication was discontinued because the bleeding had stopped. On April 20, 1957 after an otherwise normal pregnancy, she gave birth to a girl, Joan.
In the fall of 1973, when Joan was a junior in high school, it was discovered that she was suffering from clear cell adenocarcinoma of the cervix. Surgery was performed at that time to correct the condition. Although it appeared initially that the doctors had succeeded in arresting the spread of the malignancy, Joan died on November 3, 1977 of "[w]idespread metastasis of clear cell adenocarcinoma and bronchopneumonia."
Clear cell adenocarcinoma of the cervix, a rare form of malignancy in Joan's age group, has been observed in recent years in girls of 14-22 and related to in utero exposure to DES.
The present case began with the filing of a complaint by Joan Lyons, her mother Claire and her father Thomas, on September 29, 1975. The complaint identified Premo as the manufacturer of the medication taken by Claire during her pregnancy with *189 Joan and alleged, against that defendant, negligence, breach of warranty, strict liability in tort and false representation. Merck & Co. was charged also with essentially the same acts and theories on the assertion that it had licensed Premo to produce stilbestrol. Eleven other drug companies were joined as defendants, the allegation against them being that it was through their joint efforts that DES was placed on the market. Compensatory and punitive damages were demanded.
Plaintiffs requested that the court relax R. 4:14-1 to allow for the early taking of depositions so that "we can determine whether or not we have all the defendants" and "the proper defendants." The motion was granted by the assignment judge.
A second order issued in January 1976 allowed plaintiffs to proceed with taking depositions from representatives of Premo, but limited them "to the discovery of such facts as may be necessary to permit plaintiff to make a determination as to the joinder of additional parties."
The discovery pursuant to these orders revealed that the DES used by Premo in the tablets taken by Claire Lyons was purchased from the manufacturer, Specific Pharmaceutical Labs, Inc., through a brokerage firm, R.W. Greeff & Co., Inc. As a result, the complaint was amended to add these two parties and Chemetron Corp., which since had acquired Specific.
All defendants but Premo moved for summary judgment. Judgment was granted on May 23, 1977 for all those not within this particular chain of distribution. The motions of Greeff and Chemetron were denied without prejudice.
On June 9, 1977 the trial judge denied plaintiffs' motion to pursue discovery against all defendants, with the exception of Specific, Chemetron, Premo and Greeff.
In October 1977 plaintiffs agreed to a settlement with both Premo and Chemetron (for Specific). The following month Joan died.
*190 The case continued against Greeff on the basis of strict liability in tort. For the purposes of a motion by Greeff for summary judgment, both parties stipulated to a series of facts. Essentially, it was agreed that the sale of DES from Specific to Premo had been arranged by Greeff and that the drug was shipped directly from Specific to Premo, with Greeff never having physical control of the product.
Finding that the drug did not become dangerous until Premo obtained it, added to it other ingredients and packaged it for sale, the trial judge dismissed the complaint against Greeff.
This appeal from both judgments followed.
Before going into the issues raised on appeal, we believe a brief account of the history and development of the drug itself will be helpful.
DES is a synthetic estrogen which provides the same effects as a natural estrogenic substance. It was first produced by Professor E.C. Dodds and his associates at Middlesex Hospital in London. The drug was not patented by Professor Dodds, but was left available for general production by pharmaceutical companies.
American drug manufacturers were interested and in 1940 began submitting applications to the FDA seeking permission to produce and market the drug. According to a deposition taken in another matter from Dr. Theodore G. Klumpp, then Chief of the Drug Division of the FDA, by the end of 1940 there were ten new drug applications (NDAs) for DES on file with the agency. It was feared that to consider each separately would present "an overwhelming problem" and so it was decided, "in the public interest," to request that the drug companies pool all their clinical materials and present them together. The companies apparently received this suggestion with little enthusiasm, but accepted it when it was pointed out that consideration of individually submitted data would mean delays in approving the applications. As a result, a committee, whose members represented the drug companies was formed which put together and *191 summarized all clinical data supplied by the individual pharmaceutical companies eventually presenting this data to the FDA.
The NDAs filed in the early 1940's, sought authorization to manufacture and distribute DES for four purposes: the treatment of post-menopausal symptoms; senile vaginitis, gonorrheal vaginitis in the pre-pubertal girls, and suppression of lactation.
At the same time research, apparently independent of the drug companies, was being conducted into the use of DES for threatened abortion and other problems in pregnancy. More enthusiasm was generated in the medical profession over the possibilities of the drug, particularly for diabetics and other women with a history of problem pregnancies. There was a great deal of activity in this area from the mid-1940s to the mid-1950s, much of it coming out of Boston. Information was exchanged among the obstetricians, based both on personal experience with the drug and numerous articles in medical journals.
In 1947, in order to benefit from all this interest and activity, many drug companies filed additional NDAs requesting authorization to market DES in larger dosages to treat pregnancy problems.
Both the enthusiasm and the activity waned in the late 1950s. In 1971 a statistical correlation was discovered between clear cell adenocarcinoma and DES. As recently as 1970, however, it was still prescribed, although rarely for pregnant women. It was in that year that a report was published which documented observation of the previously rare malignancy in girls of 14 to 22. In November 1971, the FDA required that a statement be included on all labels informing that "DES was contraindicated for use in the prevention of miscarriages."
The drug is still prescribed today, however. It is presently approved for use as an estrogen replacement in cases of hormone deficiency; therapy for menopausal symptoms; treatment of some cases of cancer, and suppression of lactation. It is also *192 the major ingredient in the "morning after" pill, a post-coital contraceptive.
Plaintiffs first argue that the trial judge erred in granting summary judgment for the drug companies. Essentially they allege that these drug companies were the moving force behind the licensing of DES; that in their haste to get it on the market they were, at best, negligent in their research and, at worst, dishonest in reporting their findings, and that Premo's applications to the FDA were based on the research of these drug companies which mandates that they share in Premo's liability.
In support of their theory, plaintiffs have provided us with the applications of the drug companies to the FDA to support theories of liability which they variously refer to as "concert of action," "joint action," "alternative liability" and "the enterprise theory of liability." Actually, these are not interchangeable terms, but describe different approaches to different situations.
The application of alternative liability to the present case can be rejected immediately since once plaintiffs succeeded in establishing that Premo manufactured the particular brand of DES ingested, they were arguably unable to rely on the alternative liability theory since, as is apparent, it requires that a plaintiff be ignorant of the source of his or her injury.
The theory applies to a Summers v. Tice, 33 Cal.2d 80, 199 P.2d 1 (Sup.Ct. 1948); Ybarra v. Spangard, 25 Cal.2d 486, 154 P.2d 687 (Sup.Ct. 1944), or Anderson v. Somberg, 67 N.J. 291 (1975), cert. den. 423 U.S. 929, 96 S.Ct. 279, 46 L.Ed.2d 258 (1975), situation in which plaintiff is unable to determine either which one of a number of potential tortfeasors is actually liable for his injury or the share of each for joint liability. Such a radical shifting of burdens from a plaintiff to a defendant is not undertaken lightly, but necessitated only by strong policy which favors recovery by innocently injured plaintiffs who could not otherwise recover because they cannot identify the source of *193 their injuries. Here, not only have plaintiffs identified the sources of their injury, but they have achieved a settlement with them.
Enterprise liability, which is described in the law review article quoted by plaintiffs as combining "the better features of concert and alternative liability into one coherent theory," is similarly inapplicable.
* * * The theory would be available to plaintiffs who cannot or might not be able to identify the actual causative agent of their injury. In all other instances it would be unavailable because traditional tort law would be sufficient to fix liability. ["DES and a Proposed Theory of Enterprise Liability," 46 Fordham L.Rev. 963, 995 (1978)]
Concert of action or joint action is the theory which is described by analogy to a drag race. In this situation P, a bystander, is injured by A's car which has been participating in a drag race with cars driven by B & C. Under this theory, P may sue any one or all of the three because their mere participation was in and of itself tortious. The purpose of this theory is not so much to solve problems of identification as to deter anti-social behavior.
Plaintiffs have tried to ignore all distinctions between the 1940 and the 1947 applications to market drugs with DES. It should be remembered that its use to combat abortions, which is the only issue here, resulted from the 1947 applications. It is true, as plaintiffs argue, that the companies made reference in their 1947 applications to those of 1940; however, it must be borne in mind that it is not the safety of DES which is being questioned; it is only its ingestion by pregnant women which has been declared unsafe, and the 1940 applications did not contemplate that use.
Plaintiffs have ignored these distinctions and have attempted to make it look as though Premo's 1947 application relied, as did their 1940, on the testing and research of Merck. The fact is that Premo did not in 1947 cite to the work of Merck or any other drug company as the basis of its application, or to testify *194 to the safety of the proposed product. Instead, it relied on articles appearing in medical journals on the use and safety of DES as a drug for combatting miscarriage. And, as discussed above, these reports resulted from the enthusiasm of the medical profession itself for what doctors saw as a possible panacea for pregnancy problems.
The 1940 applications do not support the "drag race" analogy because there was nothing anti-social about placing DES on the market for its pre-1947 purposes. Plaintiffs apparently overlook the fact that products containing DES are still in use today with full approval of the FDA and the Surgeon General. It can hardly be said, therefore, that the drug companies' conduct in seeking approval for the drug in 1940 should be classified as tortious. It is 1947 with which we are concerned, and none of the companies is implicated in Premo's decision to market DES in 25 mg. tablets for pregnant women. In fact, not all the companies joined as defendants even manufacture the drug in that dosage themselves. Plaintiffs have failed to show that the drug company defendants were in any way responsible for the particular product which caused Joan Lyons' death.
As to plaintiffs' second point, that the trial judge erred in granting summary judgment without additional discovery: If the defendants in the case are to be limited to those in the actual chain of distribution of this product, then there was no need for further discovery. The discovery which was provided had enabled plaintiffs to identify all those who had had a hand in placing Mrs. Lyons' tablets in the stream of commerce.
Plaintiffs next contend that it was error to have dismissed the complaint against the broker Greeff.
Section 402A of Restatement Torts 2d, attributes liability if:
(a) the seller is engaged in the business of selling such a product; and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
*195 The comments explain that the rule "extends to any product sold in the condition, or substantially the same condition, in which it is expected to reach the ultimate user or consumer." It "applies to any manufacturer" and "to any wholesale or retail dealer or distributor."
What must be considered, therefore, is whether (1) the DES which found its way to Mrs. Lyons after being packaged and marketed by Premo was in the same condition as it was at the time Greeff arranged its sale and/or (2) if Greeff can be found to have been a distributor of that DES.
In Walker v. Stauffer Chemical Corp., 19 Cal. App.3d 669, 96 Cal. Rptr. 803 (D.Ct.App. 1971), a drain cleaner, composed of 50% sulfuric acid and 50% alkaline base, exploded. The manufacturer of the sulfuric acid was sued on the basis of strict liability. The court held that compounding the two substances "substantially altered" the acid so that the resulting product could "in no way be considered to be one and the same bulk sulfuric acid manufactured by Stauffer and sold to [the drain cleaner manufacturer]." (96 Cal. Rptr. at 805).
We do not believe it realistically feasible or necessary to the protection of the public to require the manufacturer and supplier of a standard chemical ingredient * * *, not having control over the subsequent compounding, packaging or marketing of an item eventually causing injury to the ultimate consumer, to bear responsibility for that injury. The manufacturer (seller) of the product causing the injury is so situated as to afford the necessary protection. [96 Cal. Rptr. at 806; emphasis supplied]
In the present case, although Premo did add inert substances to the bulk drug before converting it to pill and capsule form, the addition of these substances (such as milk sugar) did nothing to alter in any significant way the drug obtained from Specific. In fact, the resulting pill or capsule was still referred to as stilbestrol or diethylstilbestrol. In that sense, therefore, plaintiffs are correct in arguing that the end product here cannot be *196 compared with the end product in Walker v. Stauffer Chemical Corp., which was substantially changed in manufacture. What is comparable, however, is that here, as there, Greeff had no control over the ultimate packaging and marketing of the product before it was offered to the public. And that, we believe, is the weakness in plaintiffs' argument as it applies to this point.
What must be kept in mind here is that the drug whose sale Greeff arranged was then, and is now, a drug approved for use by the FDA. It is not DES which is defective, as claimed by plaintiffs; it is only DES when used by pregnant women that has been shown to be carcinogenic. It has never been demonstrated that the user of the drug herself, or himself, is harmed. Use of this drug represents the tragedy of the harm being visited on the unborn child, the daughter of the user.
Premo was manufacturing more than an anti-abortion pill using DES. It was producing drugs in different dosages for different purposes. Greeff asserts that it had no knowledge of the specific use to which the bulk DES was being put. Plaintiffs do not dispute this; they try to obfuscate it. It was Premo's decision as to how the drug would be packaged, whether in harmless 5 mg. pills for various prescribed uses or in 25 mg. pills for pregnant women. Greeff had no control over and no knowledge of this decision.
There is no doubt that Greeff was, in a sense, in the chain of distribution and contributed to placing the product in the stream of commerce. But it must be shown that it exercised control over the product. Scanlon v. General Motors Corp., 65 N.J. 582, 590 (1974).
It is undisputed that Greeff never had physical control over the DES. It merely arranged the sale; the drug was shipped directly from Specific to Premo.
Greeff's role seems to be more that of a facilitator than an active participant. Although it is true that the DES manufactured by Specific was selected by Greeff, rather than having *197 been requested specifically by Premo, there is no allegation that it was only Specific's product which was carcinogenic and not that of Lilly, Merck or any other manufacturer. Quite the contrary, DES appears to be a fungible item which is not even prescribed necessarily under a particular brand name. Mrs. Lyons received Premo's product because that was what the druggist had available at the time, not because it was what the doctor ordered. Greeff's selection of Specific as the manufacturer, therefore, contributed in no way to Joan's illness. Greeff did nothing more than place an order dictated by Premo. While it received payment for its part in the transaction, liability is not to be predicated on profit.
Had Greeff had any active role in Premo's decision either to purchase DES or to package it for pregnant women, it would stand in a different relationship to the plaintiffs. But in view of the very passive part it played, we fail to see why it should be included among those who face judgments based on strict liability. Its duty to these plaintiffs was remote at best, with three equally knowledgeable parties standing between it and Claire Lyons. Additionally, we think it is important to keep in mind that the Lyons family has already settled with both manufacturers: Specific, the manufacturer of the bulk DES, and Premo, the manufacturer of the pills Mrs. Lyons ingested. These two, particularly Premo, were better able than Greeff to guard against the injury and are, we think, the proper parties to pay.
Although it cannot be said that under all circumstances the distributor of a product is free from liability, it seems to us that the circumstances existing here are sufficient to uphold the trial judge's dismissal of the complaint against Greeff.
Affirmed.