GAIL NAMM AND PAUL NAMM, HER HUSBAND, PLAINTIFFS-APPELLANTS, v. CHARLES E. FROSST AND CO., INC., LAKESIDE LABS, A DIVISION OF COLGATE PALMOLIVE CO., AYERST MCKENNA AND HARRISON LTD., S. P. DURST AND CO. INC., METROPOLITAN LABS, INC., A DIVISION OF MICHIGAN CHEMICAL CORP., DRUG PRODUCTS COMPANY, HARROWER LABS INC., WINTHROP PRODUCTS, A DIVISION OF STERLING DRUG INC., SCHIEFFELIN CO., DIFCO LABS INC., KREMERS-URBAN CO., BUFFINGTONS INC., RAYMER PHARMACAL CO., LEDERLE LABS, A DIVISION OF AMERICAN CYNAMID CO., PRO-MEDICO LABS INC., PITMAN-MOORE CO., A DIVISION OF DOW CHEMICAL CO., ZIEGLER PHARMACAL CO., J. F. HARTZ AND CO., UNITED DRUG CO., ADSON-INTRASOL LABS INC., PHYSICIANS DRUG AND SUPPLY CO., SHORES CO., VANPATTEN PHARM CO., BROAD RESEARCH LABS INC., WILLIAM F. STRAUB AND CO., MUTUAL PHARMACAL CO., C. B. KENDALL CO., A DIVISION OF WESTERFIELD PHARM CO., DIRECT SALES CO., INC., HOOSIER PHARMACAL CO., PURITY DRUG CO., INC., GLAXO RESEARCH LTD./ENGLAND HORTON AND CONVERSE, FIDELITY MED SUPPLY CO., HIGH CHEMICAL CO., A DIVISION OF DAY AND FRICK, INC., VERAX PRODS INC., BEATRICE SCIENTIFIC CO., SUCCESSOR IN INTEREST TO WESTFIELD LABORATORIES, INC., AND GRANT CHEMICAL CO., DEFENDANTS, AND ELI LILLY & COMPANY, DURR-FILLAUER MEDICAL, INC., ABBOTT LABS, AYERST LABS INC., A DIVISION OF AMERICAN HOME PRODUCTS CORP., E. R. SQUIBB AND SONS INC., A DIVISION OF OLIN MATHISON CHEMICAL CORP., MERCK SHARP AND BOHME, A DIVISION OF MERCK AND CO., INC., ARMOUR LABS, A DIVISION OF ARMOUR PHARM. CO., WINTHROP CHEMICAL CO., UPJOHN COMPANY, MERRELL-NATIONAL LABS, A DIVISION OF RICHARDSON-MERRELL INC., BURROUGHS WELLCOME AND CO., INC., SMITH MILLER AND PATCH INC., ENDO PRODUCTS INC., CROOKES LABS INC., WILLIAM H. RORER INC., CARROLL D. SMITH PHARMACAL CO., A DIVISION OF SMITH MILLER AND PATCH INC., COLE PHARMACAL CO., MCNEIL LABS INC., HARVEY LABS INC., PENNWALT CORPORATION, SUCCESSOR TO R. J. STRASENBURGH, INC., IMPROPERLY DESIGNATED AS R. J. STRASENBURGH LABS, A DIVISION

OF WALLACE AND TIERNAN, INC., E. S. MILLER LABS INC., A DIVISION OF SMITH MILLER AND PATCH INC., PREMO PHARM LABS INC., BLUE LINE CHEMICAL CO., FLINT-EATON AND CO., A DIVISION OF BAXTER LABS INC., E. L. PATIH CO., VAN PELT AND BROWN INC., S. B. PENICK AND CO., CIBA PHARM PRODUCTS INC., A DIVISION OF CIBA PHARM CO., MALTBIE LABS, INC., IMPROPERLY DESIGNATED AS MALTBIE LABS, A DIVISION OF PENNWALT CORP., VALE CHEMICAL CO., INC., G. H. SHERMAN MD, INC., G. W. CARNRICK CO., WILLIAM WARNER, A DIVISION OF WARNER HUDNUT INC., S. E. MASSENGILL CO., GELATIN PRODS CO., WALLACE AND TIERNAN PRODS INC., U. S. STANDARD PRODS CO., BOYLE AND CO., AND REXALL DRUG CO., DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued December 8, 1980—Decided February 5, 1981.

Before Judges BISCHOFF, FRANCIS and MORTON I. GREENBERG.

*Morris M. Schnitzer* argued the cause for appellants (*Freeman, Friedman, Mantel, Wilson & Carney*, attorneys; *Morris M. Schnitzer* on the brief).

*John L. McGoldrick* argued the cause for respondent Eli Lilly and Company (*McCarter & English*, attorneys; *John L. McGoldrick*, on the brief).

*Stryker, Tams & Dill*, attorneys for defendants-respondents, Durr-Fillauer Medical, Inc., improperly designated "Intra Products Division of Durr Products," Premo Pharmaceutical Laboratories, Inc. (*David L. Menzel* on the letter brief).

*Carpenter, Bennett & Morrissey*, attorneys for defendant-respondent Endo Laboratories, Inc. (*John P. Dwyer*, of counsel; *Linda B. Celauro* on the brief).

*Riker, Danzig, Scherer, Debevoise & Hyland*, attorneys for defendant-respondent Merrell-National Laboratories, a division of Richardson-Merrell Inc. (*Peter N. Perretti, Jr.*, of counsel; *Susan Scott* on the brief).

*Connell, Foley & Geiser*, attorneys for defendant-respondent The Blue Line Chemical Co.

*Lum, Biunno & Tompkins*, attorneys for defendant-respondent Abbott Laboratories.

*Porzio & Bromberg, P. C.*, attorneys for defendants-respondents Ayerst Laboratories, Division of American Home Products Corporation, and McNeil Laboratories, improperly designated "McNeil Labs Inc."

*Sills, Beck, Cummis, Radin & Tischman*, attorneys for defendant-respondent E. R. Squibb & Sons, Inc.

*Shanley & Fisher*, attorneys for defendant-respondent Merck Sharp & Dome, a Division of Merck & Co., Inc.

*Morgan, Melhuish, Monaghan & Spielvogel*, attorneys for defendants-respondents Armour Pharmaceutical Company, improperly designated "Armour Labs, a division of Armour Pharm. Co.", and Ciba-Geigy Corporation, improperly designated "Ciba Pharm Products, Inc."

*Purcell, Ries & Shannon*, attorneys, for defendant-respondent Winthrop Laboratories, a Division of Sterling Drug, improperly designated "Winthrop Chemical Co." (*Eugene M. Purcell* on the letter brief).

*Lamb, Hutchinson, Chappell, Ryan & Hartung*, attorneys for defendant-respondent The Upjohn Company.

*Braff, Litvak, Ertag, Wortmann & Harris*, attorneys for defendant-respondent Burroughs Wellcome and Co., Inc.

*Kuttner & Toner*, attorneys for defendants-respondents Carroll D. Smith Pharmacal Company, a Division of Smith, Miller & Patch, E. S. Miller Labs, Inc., a Division of Smith, Miller & Patch, and Smith, Miller & Patch, a Division of Cooper Laboratories, Inc., Crookes Labs, Inc., E. L. Patch Company and Sherman MD, Inc. (*Roger L. Toner* of counsel).

*O'Donnell & McCord*, attorneys for defendant-respondent William H. Rorer, Inc.

*Haggerty & Donohue, P. C.*, attorneys for defendants-respondents Cole Pharmacal Co., G. W. Carnick Co. and Vale Chemical Co., Inc.

*Lieb, Berlin & Kaplan, P. C.*, attorneys for defendant-respondent Harvey Laboratories, Inc.

*Draesel, Sunshine & Atkins,* attorneys for defendant-respondent Pennwalt Corporation, successor to R. J. Strasenburgh, Inc., improperly designated "R. J. Strasenburgh Labs, a Division of Wallace & Tiernan, Inc.", Maltbie Laboratories, Inc., improperly designated "Maltbie Labs, a Division of Pennwalt Corp.", and Wallace & Tiernan Products, Inc.

*Feehan & Feehan,* attorneys for defendants-respondents Van Pelt and Brown, Inc., William Warner, a division of Warner-Hudnut, Inc. and S. E. Massengill Company.

*Wittman, Anzalone, Bernstein & Dunn,* attorneys for defendant-respondent S. B. Penick & Co.

*Morrison & Griggs,* attorneys for defendants-respondents Gelatin Products Company and High Chemical Company.

*Harwood, Lloyd, Kelly, Ryan, Coyle & Wulster,* attorneys for defendant-respondent Flint-Eaton & Co., a division of Travenol Laboratories, Inc., improperly designated "Flint-Eaton and Co., a division of Baxter Labs Inc."

*Pantages, Sellar, Richardson & Stuart,* attorneys for defendant-respondent U. S. Standard Products Company (*Louis J. Pantages,* of counsel; *Charles Crow* on the brief).

*Richard V. Caplan,* attorney for defendant-respondent Boyle & Company Pharmaceuticals.

*McDermott & McGee,* attorneys for defendant-respondent Rexall Drug Company (*John P. McGee* on the brief).

The opinion of the court was delivered by

BISCHOFF, P. J. A. D.

This is a pharmaceutical products liability case wherein plaintiffs appeal from a summary judgment dismissing their complaint against approximately 44 drug manufacturing and distributing companies. The compliant charges defendants with liability based upon principles of negligence, breach of warranties and strict liability.

Plaintiffs Gail Namm and Paul Namm, are husband and wife and in their complaint they allege that prior to February 15, 1949 all of the defendants named "manufactured, compounded, tested, sold and marketed" large quantities of synthetic estrogen known as "diethylstilbestrol", "stilbestrol" and "dienestrol" (hereinafter referred to collectively as DES) in prescription drug form. The drug was promoted for use by pregnant women to prevent loss of the fetus by spontaneous abortion. Plaintiff Gail Namm was born February 15, 1949. Prior thereto her mother had ingested DES obtained by prescription from her obstetrician to prevent termination of her pregnancy by spontaneous abortion. Plaintiffs allege that Gail Namm developed adenocarcinoma of the vagina and "underwent a total abdominal hysterectomy" in August 1975, and that the adenocarcinoma Gail developed was caused by the DES ingested by her mother.

The complaint was filed August 1, 1977. Although more than 300 companies [1] have manufactured or sold DES since 1941, the complaint names only 74 companies as defendant-manufacturers; 44 were served and answered the complaint. On June 22, 1977 an order was entered fixing dates for service of the complaint and for the filing of answers. The order postponed indefinitely the assertion of crossclaims and third-party claims and provided for orderly discovery as to the identification of the pharmaceutical and the identification of the manufacturer. Discovery as to identification was obtained from plaintiffs, Gail Namm's parents, their doctor and pharmacist, hospital records and representatives of defendant drug companies. The primary source of information as to identification of both the drug and the manufacturer was obtained from Mrs. Vernick, Gail's moth-

---

[1] It is asserted in this record that there were 300 manufacturers of the drug. That number is also asserted by the court in its opinion in the case of *Abel v. Eli Lilly and Company*, 94 *Mich.App.* 59, 289 *N.W.*2d 20, 23 (Ct.App.1979). However, in the case of *Sindell v. Abbott Laboratories*, 26 *Cal.*3d 588, 607 *P.* 2d 924, 931; 163 *Cal.Rptr.* 132, 139 (Sup.Ct.1980), *cert. den.* —— *U.S.* ——, 101 *S.Ct.* 286, 66 *L.Ed.*2d 140 (1980), it is stated that the number of manufacturers is 200.

er. She recalled that she obtained pills (as opposed to capsules or other forms of oral medication) during her pregnancy. The original prescription came from Dr. Bogen, her obstetrician, and the medication was obtained from Elks Drug Store in Brooklyn. While she did not recall what the pill container looked like, she did recall there were several different pill sizes but none smaller than five milligrams. They were white or light in color and contrasted with the dark surface of her kitchen counter. She was unable to provide any other details concerning the appearance or physical characteristics of the pills.

The owner of the pharmacy obtained drug supplies from wholesalers, cash peddlers, manufacturers and other local drug stores. He had no recollection or records which shed any light on either the source of his supply of DES or purchases by the Vernicks. Nor was he able to state when he first began to supply DES, where he obtained it or the physical characteristics of the DES he did supply.

Other discovery did not provide any information whatsoever as to the identification of the manufacturer or distributor or as to the nature or appearance of the pharmaceutical.

All defendants thereafter moved for summary judgment, primarily on the grounds that plaintiff had failed to identify the manufacturer or to produce any evidence linking any individual defendant with the drugs which allegedly caused plaintiff's injuries (the defendants have many other defenses which are all reserved and are not involved in this appeal). It was for this reason that the trial judge granted the summary judgment as to all 44 defendants.

Plaintiffs conceded at oral argument in the trial court and before us that they were unable to identify the manufacturer or distributor of the drug allegedly causing plaintiff's injury and that it was unlikely that they would be able to do so. However, for reasons to be considered below, plaintiffs argue it is not necessary that they do so in order to maintain this action.

The history of the development and marketing of DES is developed in the record herein and has been set forth in detail in two reported cases. *Lyons v. Premo Pharmaceutical Labs*, 170 *N.J.Super.* 183 (App.Div.1979); *Feriggno v. Eli Lilly & Co.*, 175 *N.J.Super.* 551 (Law Div.1980). *See, also Sindell v. Abbott Laboratories, supra.* The narrow issue presented by this appeal makes it unnecessary for us to consider this historical background other than to note that the manufacture, development and marketing of the pharmaceutical has continued since 1941 and that its use for various medical problems has been and still is approved, although approval for its use in the prevention of spontaneous abortion was discontinued in 1971.

The order and judgment entered on July 20, 1978 granting defendants' motion for summary judgment reserved to plaintiffs the right to apply for relief from the judgment within a reasonable time if they obtain knowledge of facts linking one of the defendants named to the product allegedly used by plaintiff's mother and alleged by plaintiff to have caused Gail Namm's injury.

"It is a fundamental principle of products liability law that a plaintiff must prove, as an essential element of his case, that the defendant manufacturer actually made the particular product which caused injury." *Gray v. U. S.*, 445 *F.Supp.* 337, 338 (S.D.Tex.1978); 1 *Hursh & Bailey, American Law of Products Liability* 2d, § 1:41 (1974); 63 *Am.Jur.*2d *Products Liability*, § 5 at 12 (1972); *e. g., Scanlon v. General Motors Corp.*, 65 *N.J.* 582, 590 (1974); Annotation, "Identity of Manufacturer of Defective Part," 51 *A.L.R.*3rd 1344, 1351.

In an attempt to circumvent this general principle plaintiffs place reliance upon two theories of liability which have been described as "alternative liability" and "enterprise liability." Plaintiffs contend that the application of either or both of these theories establishes that the grant of summary judgment was improper.

### Alternative Liability

This theory is said to evolve from those cases which hold that if a party cannot identify which of two or more defendants caused an injury, the burden of proof may shift to the defendants to show that they were not responsible for the harm. *Sindell v. Abbotts Laboratories, supra,* 607 *P.*2d at 928. This theory does not apply where a joint tort is involved, but rather where independent acts by two or more joint tortfeasors· are alleged to have occurred, with all the tortfeasors having acted wrongfully, but only one having injured plaintiff. *Abel v. Eli Lilly & Co., supra,* 289 *N.W.*2d at 25.

Plaintiffs argue that where, as here, "the presumption of liability verging toward a certainty is against one or more of the defendants" [2] the theory of alternative liability shifts the burden to each defendant in turn to come forward with proof of its particular activity as it relates to the supply and distribution of its output of DES in explanation or exoneration of its conduct, and that if any named defendant feels additional manufacturers of DES are needed to complete the roster of named defendants, it is free to bring them into the litigation as added defendants. Plaintiffs continue to argue that not only does the burden of proof shift to each defendant becoming one of exculpation but that plaintiffs are entitled to a charge that requires a jury to render a verdict in favor of plaintiffs against at least one defendant.

Plaintiffs further argue that they are entitled to proceed to trial where each defendant will be motivated to fix responsibility upon others as part of the incentive to accomplish their own exculpation.

---

[2]Since this is an appeal from a summary judgment granted on the limited issue of identification, we accept this statement concerning the "presumption of liability" without comment. We note, however, that defendants contend there are disputed issues of causation.

In support of this theory plaintiffs rely upon three cases: *NOPCO Chemical Div. v. BLAW-Knox Co.*, 59 *N.J.* 274 (1971); *Anderson v. Somberg*, 67 *N.J.* 291 (1975), *cert.* den., 423 *U.S.* 929, 96 *S.Ct.* 279, 46 *L.Ed.2d* 258 (1975), and *Summers v. Tice*, 33 *Cal.* 2d 80, 199 *P.2d* 1 (Sup.Ct.1948).

In *NOPCO* plaintiff purchased a large, heavy, commercial drying machine. After it was delivered to plaintiff's place of business it was discovered to have been damaged. Plaintiff sued the manufacturer and "all carriers and bailees who successively, but unconnectedly, handled [it] until it reached its final destination." *Id.* at 274. At trial plaintiff was unable to establish which particular defendant's conduct caused the damage and plaintiff's action was dismissed as to all defendants at the close of plaintiff's case. The Appellate Division affirmed, 113 *N.J.Super.* 19 (App.Div.1971); the Supreme Court reversed, holding that when a plaintiff sues all potentially responsible defendants in a transportation-bailee situation in the alternative, the burden is on defendants to come forward with explanatory or exonerating evidence. 59 *N.J.* at 283.

This holding was firmly anchored in the findings that (1) all probable defendants were before the court, *id.* 281; (2) the situation arose out of a commonplace mercantile situation, *id.* 282 (3) with a complex transportation-bailee chain and (4) with all the necessary facts peculiarly within defendant's knowledge. *Id.* 282.

Instead of dispensing with proof of identification, the court in its instructions relating to the new trial that it ordered, indicated that the burden was on plaintiff to prove "the identity of the respective defendants who handled [the machine], and the general capacities in which they did so." 59 *N.J.* at 284.

Certain key factors in *NOPCO* provide the underlying policy justification for the decision and serve to distinguish it from this case. First, there was no doubt that all persons who could possibly have been responsible for the damage to the machine were before the court either as plaintiffs or defendants. In this

case it is patent they are not. Second, the facts necessary to establish the actual identity of the responsible party were peculiarly within the knowledge of the defendants. No such superior knowledge appears here. Third, the mere fact of damage to the dryer gave rise to certain presumptions supporting plaintiff's recovery from defendant warrantors, carriers and bailees. Such a presumption is not present here. Fourth, there existed a direct traditional duty owed to plaintiff by each defendant arising from separate contractual obligations or common law duties. 59 *N.J.* at 281–282. Not one of the four policy justifications for *NOPCO* is present in this case.

In *Anderson* defendant Somberg performed a laminectomy on plaintiff Anderson at defendant St. James Hospital. In the course of surgery the tip of a surgical instrument (a "rongeur") manufactured by defendant Lawton and distributed by defendant Reinhold broke off within plaintiff's spinal canal and could not be retrieved.

The Supreme Court described the respective theories against the defendants as:

> Plaintiff sued: (1) Dr. Somberg for medical malpractice, alleging that the doctor's negligent action caused the rongeur to break; (2) St. James Hospital, alleging that it negligently furnished Dr. Somberg with a defective surgical instrument; (3) Reinhold-Schumann, Inc. (Reinhold), the medical supply distributor which furnished the defective rongeur to the hospital, on a warranty theory, and (4) Lawton Instrument Company (Lawton), the manufacturer of the rongeur, on a strict liability in tort claim, alleging that the rongeur was a defective product. In short, *plaintiff sued all who might have been liable for his injury, absent some alternative explanation such as contributory negligence.* [67 *N.J.* at 295; emphasis supplied].

Plaintiff's expert testified that a rongeur used properly and not defective could not break. 67 *N.J.* at 295. The proofs at the close of all the evidence were as follows:

> In short, when all the evidence had been presented, no theory for the cause of the rongeur's breaking was within reasonable contemplation save for the possible negligence of Dr. Somberg in using the instrument, or the possibility that the surgeon had been given a defective instrument, which defect would be attributable to a dereliction of duty by the manufacturer, the distributor, the hospital or all of them. [*Id.* at 296].

Hence, not only had plaintiff joined all parties who might have been liable for his injury—as in *NOPCO* a small, finite, readily identifiable group—but also the evidence was such that the injury must have been the responsibility of one of the named defendants.

The jury had returned a verdict in favor of each defendant. That judgment was reversed by the Appellate Division, 134 *N.J.Super.* 1 (App.Div.1973) which reversal was affirmed by the Supreme Court. 67 *N.J.* 291 (1975).

It is clear that both the Appellate Division and the Supreme Court limited its consideration to the case before them and were neither establishing any new theory of joint, collective or alternative liability, nor espousing a wholesale shifting of the burden of proof. The case before them contained the following basic facts:

1. Causation was beyond question.
2. All possible tortfeasors were known and before the court.
3. Defendants were in a better position than plaintiff to identify the culpable party among them.

Based thereon the court stated the rule to be:

> We hold that in a situation like this, the burden of proof in fact does shift to defendants. All those in custody of that patient or who owed him a duty, as here, the manufacturer and the distributor, should be called forward and should be made to prove their freedom from liability. The rule would have no application except in those instances where the injury lay outside the ambit of the surgical procedure in question; for example, an injury to an organ, when that organ was itself the object of medical attention, would not by itself make out a *prima facie* case for malpractice or shift the burden of proof to defendants. [*Id.* at 302]

In *Anderson*, unlike here, it was certain that there was before the court at least one defendant whose breach of a direct duty owing to plaintiff resulted in plaintiff's harm. The "pure and undisguised speculation" (*id.* at 305) that non parties in addition to at least one of the named defendants might also be responsible for plaintiff's damages, did not deter the court from shifting the burden of going forward and the burden of proof in favor of plaintiff. In this case, on the contrary, it is "pure and undisguised speculation" to assume that any one of the defendants

named actually manufactured the drug which caused plaintiff's harm.

Plaintiffs assert that the dilemma arising from complexities of identification should shift the burden of going forward to each of the defendants. However, there is nothing inherent in the conduct of defendants or in the manufacture of DES which creates this "complexity of identification."

Moreover, there is nothing in this record to suggest that any defendant is in a better position to make the required identification than is plaintiff. The policy considerations underlying the *NOPCO* and *Anderson* holdings are lacking here.[3]

Plaintiffs also rely on *Summers v. Tice, supra.* There plaintiff went hunting with the two defendants and specifically cautioned them to stay in line and be careful. However, when a bird was flushed, both defendants fired at it even though plaintiff Summers was directly in the line of fire and clearly visible. Summers was hit once in the eye and once in the lip. It was determined that both defendant hunters were negligent in firing their guns in the direction of plaintiff and that plaintiff could not identify which of the negligent defendants' shots hit him. The court shifted the burden of proof as to whose shot actually hit plaintiff to the two admittedly negligent hunters, the only possible tortfeasors. The rationale offered for this break with existing law was the court's conclusion that defendants had better access to the evidence. 33 *Cal.*2d at 86–87, 199 *P.*2d at 4.

---

[3]*Ferrigno v. Eli Lilly & Co.*, 175 *N.J.Super.* 551 (Law.Div.1980), is a DES case involving multiple plaintiffs, multiple defendants and an asserted inability on plaintiffs' part to identify the manufacturers of the DES ingested by some of the plaintiffs' mothers. In ruling on a motion for summary judgment because of plaintiffs' inability to identify the manufacturer, the trial judge interpreted *Anderson v. Somberg, supra*, as sufficient authority for submitting the identification issue to the jury, thus requiring the defendants to exculpate themselves. We disagree with this reading of *Anderson* and decline to follow it.

In *Summers* the only possible defendants were before the court and each defendant acted negligently toward plaintiff by firing his gun in plaintiff's direction. The uncertainty as to whose negligence actually caused plaintiff's injury was left to defendants to resolve. Evidence as to the identity of the responsible defendant was obviously more available to the defendants than to plaintiff in that case. The *Restatement, Torts* 2d, § 433B, is in accord.

The theory of alternative liability has been accepted in principle in one reported DES case, *Abel v. Eli Lilly Co., supra.* However, in that case plaintiffs alleged that the named defendants constituted all the known manufacturers of DES whose products were distributed in Michigan during the relevant period. 289 *N.W.*2d at 22.

*Sindell v. Abbotts Laboratories, supra,* is a DES case instituted by multiple plaintiffs as a class action where five manufacturers were named defendants. Plaintiffs were unable to identify the actual manufacturer and the record indicated 200 potential manufacturers of the drug during the relevant time period. The court there rejected the alternative liability theory represented by *Summers v. Tice.* However, the court did reverse a judgment dismissing plaintiffs' action, remanding the case for a full trial upon causation, with directions to allocate to each defendant a share of the assessed damages equal to each defendant's share of the DES market.

The application of the principle of alternative liability to any one or all of the 44 defendants herein would impose liability without fault upon any one who manufactured a product manufactured by others as well. It would result in the taking of the property of all the named defendants in order to pay for harm which may have been caused by only one of the defendants, or even by one who is not a party to the lawsuit, who is unknown to the defendants, over whom they have no control or even any meaningful contact.

While this theory of liability was discussed in the case of *Lyons v. Premo Pharmaceutical Labs Inc., supra,* 170 *N.J.Super.* at 192, it was held inapplicable because the manufacturer of the DES ingested by the mother had been identified.

We reject the theory of alternative liability on principle.

■ There is a more cogent reason for our refusal to adopt the theory of alternative liability. In order to do so traditional concepts and basic principles would of necessity be either distorted or abandoned altogether. "As an intermediate appellate court we adhere to existing laws of the State and in the absence of appropriate amendatory legislation 'any departure from it should be undertaken by the court of last resort and not by the appellate division.'" *Silagy v. State,* 105 *N.J.Super.* 507 (App. Div.1969), certif. den. 54 *N.J.* 506 (1969).

### Enterprise Liability

Plaintiffs argue that liability should be imposed upon defendants collectively because "the acceptance of DES by the medical profession and the unsuspecting public was the consequence of a cumulative effort by all who entered the market as manufacturers ... [and] of immense promotion and advertising to which defendant's contributed a mite, or a treasure or something in between."

■ Plaintiffs conceded in the trial court and at least tacitly in this court that this theory is contrary to the established law of this State, but claimed that the traditional requirement of manufacturer identification in a product liability case should be discarded here because each defendant participated in an "industry enterprise" and a "pervasive and cumulative market effort."[4] This theory referred to as "enterprise liability" or "industry wide liability," if adopted, would impose liability upon

---

[4] See student note advocating the adoption of such a theory. "DES and a Proposed Theory of Enterprise Liability," 46 *Fordham L.R.,* 963 (1978).

each member of an industry who manufactures or produces a product which causes injury or harm to a consumer. The share of liability of each member of the industry would be measured by reference to that defendant's share of the market for the product.

The adoption of this theory of liability was urged in the DES cases of *Lyons v. Premo Pharmaceutical Labs Inc., supra*, 170 *N.J.Super.* at 193; *Ferrigno v. Eli Lilly & Co., supra* at 570–571 and *Abel v. Eli Lilly & Co., supra*, 94 *Mich.App.* at 76–78; 289 *N.W.*2d at 27. However it was unnecessary for the courts to rule on the issue in those cases and they did not do so. The theory was specifically rejected in *Sindell v. Abbott Laboratories, supra*, 26 *Cal.*3d at 606, 607 *P.*2d at 933.

■ Adoption of this legal theory would, of necessity, result in total abandonment of the well settled principle that manufacturers are only responsible for damages caused by a defective product upon proof that the product was defective and that the defect arose while the product was in the control of defendant. *Scanlon v. General Motors Corp.*, 65 *N.J.* 582, 590 (1974). And traditional methods of assessing and apportioning damages among defendants would also, of necessity, have to be abandoned and new ones fashioned.

■ We are bound by the principles of law developed and declared by our Supreme Court. Extensive policy shifts of this magnitude should not be initiated by an intermediate appellate court. The appropriate tribunal to accomplish such drastic changes is either the Supreme Court or the Legislature. *State in the Interest of A.C.*, 115 *N.J.Super.* 77, 84 (App.Div.1971); *Silagy v. State, supra.*

We reject the theory of enterprise liability on both principle and precedent.

Affirmed.